(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TARRANT REGIONAL WATER DISTRICT *v.* HERRMANN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 11–889.   Argued April 23, 2013—Decided June 13, 2013

The Red River Compact (or Compact) is a congressionally sanctioned
agreement that allocates water rights within the Red River basin
among the States of Oklahoma, Texas, Arkansas, and Louisiana.
The area it governs is divided into five separate subdivisions called
"Reaches," each of which is further divided into smaller "subbasins."
At issue here are rights under the Compact to water located in Okla-
homa's portion of Reach II, subbasin 5.  In Reach II, the Compact—
recognizing that Louisiana lacks suitable reservoir sites to store wa-
ter during high flow periods and that the upstream States (Texas,
Oklahoma, and Arkansas) were unwilling to release their own stored
water for the benefit of a downstream State—granted control over
the water in four upstream subbasins (subbasins 1 through 4) to the
States in which each subbasin is located and required that water in a
fifth subbasin, subbasin 5, be allowed to flow to Louisiana at certain
minimum levels.  Section 5.05(b)(1) of the Compact gives the States
"equal rights" to the use of subbasin 5's waters when the flow is 3,000
cubic feet per second (CFS) or more, "provided no state is entitled to
more than 25 percent of the water in excess of 3,000 [CFS]."  Under
the Compact, States are also entitled to continue with their intra-
state water administration.

Petitioner Tarrant Regional Water District (Tarrant) is a Texas
state agency responsible for providing water to north-central Texas
and its rapidly growing population.  After unsuccessfully attempting
to purchase water from Oklahoma and others, Tarrant sought a wa-
ter resource permit from the Oklahoma Water Resources Board
(OWRB), respondents here, to take surface water from a tributary of
the Red River at a point located in Oklahoma's portion of subbasin 5

of Reach II. Knowing that the OWRB would likely deny its permit application because of Oklahoma water laws that effectively prevent out-of-state applicants from taking or diverting water from within Oklahoma's borders, Tarrant filed suit in federal court simultaneously with its permit application, seeking to enjoin the OWRB's enforcement of the state statutes on grounds that they were pre-empted by federal law in the form of the Compact and violated the Commerce Clause by discriminating against interstate commerce in water. The District Court granted summary judgment for the OWRB, and the Tenth Circuit affirmed.

*Held*:

1. The Compact does not pre-empt the Oklahoma water statutes. Pp. 9–22.

(a) Tarrant claims that §5.05(b)(1) creates a borderless common in subbasin 5 in which each of the signatory States may cross each other's boundaries to access a shared pool of water. Tarrant observes that §5.05(b)(1)'s "equal rights" language grants each State an equal entitlement to subbasin 5's waters, subject to a 25 percent cap, and argues that its silence concerning state lines indicates that the Compact's drafters did not intend the provision to allocate water according to state borders. The OWRB counters that §5.05(b)(1)'s "equal rights" afford each State an equal opportunity to use subbasin 5's excess water within each State's own borders, but that its silence on cross-border rights indicates that the Compact's drafters had no intention to create any such rights in the signatory States. Pp. 9–11.

(b) Because interstate compacts are construed under contract-law principles, see *Texas* v. *New Mexico*, 482 U. S. 124, 128, the Court begins by examining the Compact's express terms as the best indication of the parties' intent. However, §5.05(b)(1)'s silence is, at the very least, ambiguous regarding cross-border rights under the Compact, so the Court turns to other interpretive tools to shed light on the drafters' intent. Three things persuade the Court that the Compact did not grant cross-border rights: the well-established principle that States do not easily cede their sovereign powers; the fact that other interstate water compacts have treated cross-border rights explicitly; and the parties' course of dealing. Pp. 11–22.

(1) The sovereign States possess an "absolute right to all their navigable waters and the soils under them for their own common use." *Martin* v. *Lessee of Waddell*, 16 Pet. 367, 410. So, for example, " '[a] court deciding a question of title to [a] bed of navigable water [within a State's boundaries] must . . . begin with a strong presumption' against defeat of a State's title." *United States* v. *Alaska*, 521 U. S. 1, 34. It follows, then, that "[i]f any inference at all is to be drawn from" silence in compacts touching on the States' authority to

control their waters, "it is that each State was left to regulate the activities of her own citizens." *Virginia* v. *Maryland*, 540 U. S. 56, 67. Tarrant contends that §5.05(b)(1)'s silence infers that the signatory States dispensed with the core state prerogative to control water within its borders. But since States rarely relinquish their sovereign powers, the better understanding is that there would be a clear indication of such devolution, not inscrutable silence. Tarrant counters that its interpretation would not intrude on any sovereign prerogative of Oklahoma, which would retain its authority to regulate the water within its borders. But adopting Tarrant's reading would necessarily entail assuming that Oklahoma and three other States silently surrendered substantial control over their waters when they agreed to the Compact. Pp. 14–16.

　　　　(2) Looking to the customary practices employed in other interstate compacts also helps in ascertaining the parties' intent. See, *e.g., Alabama* v. *North Carolina*, 560 U. S. 330, ___. Many compacts feature unambiguous language permitting signatory States to cross each other's borders to fulfill obligations under the compacts, and many provide for the terms and mechanics of how such relationships will operate. The absence of comparable provisions in the Red River Compact strongly suggests that cross-border rights were never intended to be part of the agreement. Tarrant claims that not all interstate compacts have such explicit language, but cites only one such compact, and even it sets out a detailed scheme that would apply to any contemplated diversions. Similarly, even if §2.05(d) of the Compact, which gives "[e]ach Signatory State . . . the right to" "[u]se the bed and banks of the Red River and its tributaries to convey stored water, imported or exported water, and water apportioned according to this Compact," is read to establish cross-border diversions, it does so through express language, not through an inference from silence. Pp. 16–20.

　　　　(3) The parties' conduct under the Compact also undermines Tarrant's position. See *Alabama* v. *North Carolina*, 560 U. S., at ___. Once the Compact was approved in 1980, no signatory State pressed for a cross-border diversion until Tarrant filed suit in 2007. And Tarrant's earlier offer to purchase water from Oklahoma was a strange decision if Tarrant believed the Compact entitled it to demand water without payment. Nor is there any indication that Tarrant, any other Texas agency, or Texas itself previously made any mention of cross-border rights within the Compact; and none of the other signatory States has ever made such a claim. P. 20.

　　　　(4) Tarrant's remaining arguments—that its interpretation is necessary to realize the "structure and purpose of Reach II"; and that §5.05(b)(1)'s 25 percent cap on each State's access to subbasin 5's ex-

cess water implies that if a State cannot access sufficient water within its borders to meet the cap, it must be able to cross borders to reach that water—are unpersuasive.  Pp. 20–22.

2. The Oklahoma water statutes also do not run afoul of the Commerce Clause.  Tarrant claims that the statutes discriminate against interstate commerce by preventing water left unallocated under the Compact from being distributed out of State.  But Tarrant's assumption that some water is left "unallocated" is incorrect.  The interpretive comment for Article V of the Compact makes clear that when the flow is above 3,000 CFS, "all states are free to use whatever amount of water they can put to beneficial use," subject to the requirement that if the amount of available water cannot satisfy all of those uses, "each state will honor the other's right to 25% of the excess flow."  If more than 25 percent of subbasin 5's water is located in Oklahoma, that water is not "unallocated"; rather, it is allocated to Oklahoma unless and until another State calls for an accounting and Oklahoma is asked to refrain from utilizing more than its entitled share. Pp. 22–24.

656 F. 3d 1222, affirmed.

SOTOMAYOR, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–889

TARRANT REGIONAL WATER DISTRICT,
PETITIONER *v.* RUDOLF JOHN
HERRMANN ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 13, 2013]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

The Red River Compact, (or Compact), 94 Stat. 3305, allocates water rights among the States within the Red River basin as it winds through Texas, Oklahoma, Arkansas, and Louisiana. Petitioner Tarrant Regional Water District (Tarrant), a Texas agency, claims that it is entitled to acquire water under the Compact from within Oklahoma and that therefore the Compact pre-empts several Oklahoma statutes that restrict out-of-state diversions of water. In the alternative, Tarrant argues that the Oklahoma laws are unconstitutional restrictions on interstate commerce. We hold that Tarrant's claims lack merit.

I
A

The Red River (or River) begins in the Llano Estacado Mesa on the border between New Mexico and Texas. From this broad plain, it first runs through the Texas Panhandle and then marks the border between Texas and Oklahoma. It continues in an easterly direction until it reaches the shared border with Arkansas. Once the River

enters Arkansas, it turns southward and flows into Louisiana, where it empties into the Mississippi and Atchafalaya Rivers.

As an important geographic feature of this region, the Red River has lent its name to a valley, a Civil War campaign, and a famed college football rivalry between the Longhorns of Texas and the Sooners of Oklahoma. But college pride has not been the only source of controversy between Texas and Oklahoma regarding the Red River. The River has been the cause of numerous historical conflicts between the two States, leading to a mobilization of their militias at one time, *Oklahoma* v. *Texas*, 258 U. S. 574, 580 (1922), and the declaration of martial law along a stretch of the River by Oklahoma Governor "Alfalfa Bill" Murray at another, see Okla. H. Res. 1121, 50th Legislature, 2d Sess. (2006) (resolution commemorating "Alfalfa Bill" Murray's actions during the "Red River Bridge War"). Such disputes over the River and its waters are a natural result of the River's distribution of water flows. The River's course means that upstream States like Oklahoma and Texas may appropriate substantial amounts of water from both the River and its tributaries to the disadvantage of downstream States like Arkansas and especially Louisiana, which lacks sufficiently large reservoirs to store water.

Absent an agreement among the States, disputes over the allocation of water are subject to equitable apportionment by the courts, *Arizona* v. *California*, 460 U. S. 605, 609 (1983), which often results in protracted and costly legal proceedings. Thus in 1955, to forestall future disputes over the River and its water, Congress authorized the States of Arkansas, Louisiana, Oklahoma, and Texas to negotiate a compact to apportion the water of the Red River basin among themselves. See Act of Aug. 11, 1955, Pub. L. 346, 69 Stat. 654. These negotiations lasted over 20 years and finally culminated in the signing of the Red

River Compact in 1978. Congress approved the Compact in 1980, transforming it into federal law. See Act of Dec. 22, 1980, 94 Stat. 3305; Compact, 1 App. 7–51.

One of the Compact's principal purposes was "[t]o provide an equitable apportionment among the Signatory States of the water of the Red River and its tributaries." §1.01(b), *id.,* at 9. The Compact governs the allocation of water along the Red River and its tributaries from the New Mexico and Texas border to its terminus in Louisiana. §§2.12(a)–(e), *id.,* at 13. This stretch is divided into five separate subdivisions called "Reach[es]," *ibid.*, each of which is further divided into smaller "subbasins," see, *e.g.,* §§5.01–5.05, *id.,* at 22–26 (describing subbasins 1 through 5 of Reach II). (See Appendix A, *infra,* for a map.)

At issue in this case are rights under the Compact to water located in Oklahoma's portion of subbasin 5 of Reach II, which occupies "that portion of the Red River, together with its tributaries, from Denison Dam down to the Arkansas-Louisiana state boundary, excluding all tributaries included in the other four subbasins of Reach II." §5.05(a), 1 App. 24–25. (See Appendix B*, infra,* for a map.) The Compact's interpretive comments[1] explain that during negotiations, Reach II posed the greatest difficulty to the parties' efforts to reach agreement. Comment on Art. V, 1 App. 27. The problem was that Louisiana, the farthest downstream State, lacks suitable reservoir sites and therefore cannot store water during high flow periods to meet its future needs. The upstream States (Texas, Oklahoma, and Arkansas), which control the River's flow, were unwilling to release water stored within their own reservoirs for the benefit of any downstream States, like

--------

[1] Interpretive comments were included in the Compact so that future readers "might be apprised of the intent of the Compact Negotiation Committee with regard to each Article of the Compact." Compact, Comment on Preamble, 1 App. 9.

Louisiana.  Without any such release, there would be no guaranteed flow of water to Louisiana.

The provisions of the Compact relating to Reach II were crafted to address this problem.  To this end, Reach II was divided into five subbasins.  The upstream subbasins, numbered 1 through 4, were drawn to end at "existing, authorized or proposed last downstream major damsites," see, *e.g.,* §5.01(a), *id.,* at 22, on the tributaries leading to the Red River before reaching the main stem of the River. These dams allow the parties managing them to control water along the tributaries before it travels farther downstream and joins the flow of the main stem of the River. For the most part, the Compact granted control over the water in these subbasins to the States in which each subbasin is located.[2]  The remaining subbasin, subbasin 5, instead requires that water be allowed to flow to Louisiana through the main stem of the River at certain minimum levels, assuring Louisiana an allocation of the River's waters and solving its flowthrough problem.

The provision of the Compact central to the present dispute is §5.05(b)(1), which sets the following allocation during times of normal flow:

> "(1) The Signatory States shall have equal rights to the use of runoff originating in subbasin 5 and un-

_____

[2] Within subbasins 1, 2, and 4, water was fully apportioned to a single State.  See Compact §5.01(b), *id.,* at 22–23 (apportioning water of subbasin 1 and its "unrestricted use" to Oklahoma); §5.02(b), *id.,* at 23 (same for Texas with respect to subbasin 2); §5.04(b), *id.,* at 24 (same for Texas with respect to subbasin 4).  Only subbasin 3, which includes portions of Oklahoma and Arkansas, breaks from this pattern and was divided along the lines of a 60-to-40 split, with both States having "free and unrestricted use of the water of this subbasin within their respective states, subject, however, to the limitation that Oklahoma shall allow a quantity of water equal to the 40 percent of the total runoff originating below the following existing, authorized or proposed last major downstream damsites in Oklahoma to flow into Arkansas." §5.03(b), *id.,* at 23–24.

designated water flowing into subbasin 5, so long as the flow of the Red River at the Arkansas-Louisiana state boundary is 3,000 cubic feet per second [hereinafter CFS] or more, provided no state is entitled to more than 25 percent of the water in excess of 3,000 [CFS]."[3]  *Id.,* at 25.

In these normal circumstances (*i.e.,* when flows at the Arkansas-Louisiana border are above 3,000 CFS), this provision and its interpretive comment make clear that "all states are free to use whatever amount of water they can put to beneficial use."  Comment on Art. V, *id.,* at 30. But if the amount of water above 3,000 CFS cannot satisfy all such uses, then "each state will honor the other's right to 25% of the excess flow."  *Ibid.*  However, when the flow of the River diminishes at the Arkansas-Louisiana border, the upstream States must permit more water to reach Louisiana.[4]  Subbasin 5's allocation scheme allows up-

————————

[3] The Compact defines "undesignated water" as "all water released from storage other than 'designated water.'"  §3.01(l), *id.,* at 17. "[D]esignated water" means "water released from storage, paid for by non-Federal interests, for delivery to a specific point of use or diversion."  §3.01(k), *ibid.*

[4] In such circumstances, the two relevant paragraphs provide:

"(2) Whenever the flow of the Red River at the Arkansas-Louisiana state boundary is less than 3,000 [CFS], but more than 1,000 [CFS], the States of Arkansas, Oklahoma, and Texas shall allow to flow into the Red River for delivery to the State of Louisiana a quantity of water equal to 40 percent of the total weekly runoff originating in subbasin 5 and 40 percent of undesignated water flowing into subbasin 5; provided, however, that this requirement shall not be interpreted to require any state to release stored water.

"(3) Whenever the flow of the Red River at the Arkansas-Louisiana state boundary falls below 1,000 [CFS], the States of Arkansas, Oklahoma, and Texas shall allow a quantity of water equal to all the weekly runoff originating in subbasin 5 and all undesignated water flowing in subbasin 5 within their respective states to flow into the Red River as required to maintain a 1,000 [CFS] flow at the Arkansas-Louisiana state boundary."  §5.05(b), *id.,* at 25.

stream States to keep the water that they have stored, but also ensures that Louisiana will receive a steady supply of water from the Red River, with each upstream State contributing during times of low flow.

To ensure that its apportionments are honored, the Compact includes an accounting provision, but an accounting is not mandatory "until one or more affected states deem the accounting necessary." §2.11, *id.,* at 13; see Comment on Art. II, *id.,* at 15–16. This is because the "extensive gaging and record keeping required" to carry out such an accounting would impose "a significant financial burden on the involved states." *Id.*, at 16. Given these costs, the signatory States did "not envisio[n] that it w[ould] be undertaken as a routine matter." *Ibid.* Indeed, it appears that no State has ever asked for such an accounting in the Compact's history. See Brief for Respondents 45; Reply Brief 11–12.

While the Compact allocates water rights among its signatories, it also provides that it should not "be deemed to . . . [i]nterfere with or impair the right or power of any Signatory State to regulate within its boundaries the appropriation, use, and control of water, or quality of water, not inconsistent with its obligations under this Compact." §2.10, 1 App. 12. Rather, "[s]ubject to the general constraints of water availability and the apportionment of the Compact, each state [remains] free to continue its existing internal water administration." Comment on Art. II, *id.,* at 14. Even during periods of water shortage, "no attempt is made to specify the steps that will be taken [by States to ensure water deliveries]; it is left to the state's internal water administration." *Ibid.*

B

In the years since the Red River Compact was ratified by Congress, the region's population has increased dramatically. In particular, the population of the Dallas-Fort

Worth metropolitan area in north Texas has grown from roughly 5.1 million inhabitants in 2000 to almost 6.4 million in 2010, a jump of over 23 percent and among the largest in the United States during this period. See Dept. of Commerce, Census Bureau, P. Mackun & S. Wilson, Population Distribution and Change: 2000 to 2010 (Mar. 2011). This growth has strained regional water supplies, and north Texas' need for water has been exacerbated in recent years by a long and costly drought. See generally Galbraith, A Drought More Than Texas-Size, International Herald Tribune, Oct. 3, 2011, p. 4.

Against this backdrop, petitioner Tarrant, a Texas state agency responsible for providing water to north-central Texas (including the cities of Fort Worth, Arlington, and Mansfield), has endeavored to secure new sources of water for the area it serves. From 2000 to 2002, Tarrant, along with several other Texas water districts, offered to purchase water from Oklahoma and the Choctaw and Chickasaw Nations. See 2 App. 336–382. But these negotiations were unsuccessful and Tarrant eventually abandoned these efforts.

Because Texas' need for water only continued to grow, Tarrant settled on a new course of action. In 2007, Tarrant sought a water resource permit from the Oklahoma Water Resources Board (OWRB),[5] respondents here, to take 310,000 acre feet[6] per year of surface water from the

———————

[5] Under §2.10 of the Compact each signatory State retains "the right or power . . . to regulate within its boundaries the appropriation, use, and control of water." *Id.,* at 12. Thus, the Compact does not expressly pre-empt any state laws that address the control of water. Oklahoma law, in turn, requires that any "state or federal governmental agency" that "intend[s] to acquire the right to the beneficial use of any water" in Oklahoma must apply to the OWRB for "a permit to appropriate" water before "commencing any construction" or "taking [any water] from any constructed works." Okla. Stat., Tit. 82, §105.9 (West 2013).

[6] An acre-foot is equivalent to the volume of one acre of surface area filled to a depth of one foot. Webster's Third New International Dic-

Kiamichi River, a tributary of the Red River located in Oklahoma. Tarrant proposed to divert the Kiamichi River, at a point located in subbasin 5 of Reach II, before it discharges into the Red River and, according to Tarrant, becomes too saline for potable use.

Tarrant knew, however, that Oklahoma would likely deny its permits because various state laws (collectively, the Oklahoma water statutes) effectively prevent out-of-state applicants from taking or diverting water from within Oklahoma's borders. These statutes include a requirement that the OWRB consider, when evaluating an application to take water out of State, whether that water "could feasibly be transported to alleviate water shortages in the State of Oklahoma." Okla. Stat., Tit. 82, §105.12(A)(5) (West 2013). The statutes also require that no permit issued by the OWRB to use water outside of the State shall "[i]mpair the ability of the State of Oklahoma to meet its obligations under any interstate stream compact." §105.12A(B)(1). A separate provision creates a permitting review process that applies only to out-of-state water users. §105.12(F). Oklahoma also requires legislative approval for out-of-state water-use permits, §105.12A(D), and further provides that "[w]ater use within Oklahoma . . . be developed to the maximum extent feasible for the benefit of Oklahoma so that out-of-state downstream users will not acquire vested rights therein to the detriment of the citizens of this state," §1086.1(A)(3). Interpreting these laws, Oklahoma's attorney general has concluded that "we consider the proposition unrealistic that an out-of-state user is a proper permit applicant before the [OWRB]" because "[w]e can find no intention to create the possibility that such a valuable resource as water may become bound, without compensation, to use by an out-of-state user." 1 App. 118.

––––––––––

tionary 19 (1966).

When Tarrant filed its permit application, it also filed suit against respondents in Federal District Court. As relevant here, Tarrant sought to enjoin enforcement of the Oklahoma water statutes by the OWRB. Tarrant argued that the statutes, and the interpretation of them adopted by Oklahoma's attorney general, were pre-empted by federal law and violated the Commerce Clause by discriminating against interstate commerce in water.

The District Court granted summary judgment for the OWRB on both of Tarrant's claims. See No. CIV–07–0045–HE, 2010 WL 2817220, *4 (WD Okla., July 16, 2010); No. CIV–07–0045–HE (WD Okla., Nov. 18, 2009), App. to Pet. for Cert. 72a–73a, 2009 WL 3922803, *8. The Tenth Circuit affirmed. 656 F. 3d 1222, 1250 (2011).[7]

We granted Tarrant's petition for a writ of certiorari, 568 U. S. ___ (2013), and now affirm the judgment of the Tenth Circuit.

## II
### A

Tarrant claims that under §5.05(b)(1) of the Compact, it has the right to cross state lines and divert water from Oklahoma located in subbasin 5 of Reach II and that the Oklahoma water statutes interfere with its ability to exercise that right. Section 5.05(b)(1) provides:

> "The Signatory States shall have equal rights to the use of runoff originating in subbasin 5 and undesignated water following into subbasin 5, so long as the flow of the Red River at the Arkansas-Louisiana state boundary is 3,000 [CFS] or more, provided no state is entitled to more than 25 percent of the water in excess of 3,000 [CFS]." 1 App. 25.

---

[7] The parties have stipulated that OWRB will not take action on Tarrant's application until this litigation has concluded. Brief for Petitioner 16.

In Tarrant's view, this provision essentially creates a borderless common in which each of the four signatory States may cross each other's boundaries to access a shared pool of water. Tarrant reaches this interpretation in two steps. First, it observes that §5.05(b)(1)'s "equal rights" language grants each State an equal entitlement to the waters of subbasin 5, subject to a 25 percent cap. Second, Tarrant argues §5.05(b)(1)'s silence concerning state lines indicates that the Compact's drafters did not intend to allocate water according to state borders in this section. According to Tarrant, "the '25 percent' language [of §5.05(b)(1)] makes clear that, in exercising its 'equal rights' to the common pool of water, no State may take more than a one-quarter *share*," Reply Brief 3, but any of the signatory States may "cross state lines to obtain [its] shar[e] of Subbasin 5 waters," Brief for Petitioner 32.

The OWRB disputes this reading. In its view, the "equal rights" promised by §5.05(b)(1) afford each State an equal opportunity to make use of the excess water within subbasin 5 of Reach II but only within each State's own borders. This is because the OWRB reads §5.05(b)(1)'s silence differently from Tarrant. The OWRB interprets that provision's absence of language granting any cross-border rights to indicate that the Compact's drafters had no intention to create any such rights in the signatory States.

Unraveling the meaning of §5.05(b)(1)'s silence with respect to state lines is the key to resolving whether the Compact pre-empts the Oklahoma water statutes.[8] If

_____

[8] The Compact Clause of the Constitution provides that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State." Art. I, §10, cl. 3. Accordingly, before a compact between two States can be given effect it must be approved by Congress. See *Virginia* v. *Maryland*, 540 U. S. 56, 66 (2003). Once a compact receives such approval, it is "transform[ed] . . . into a law of the United States." *Ibid.* (internal quotation marks omitted). The

§5.05(b)(1)'s silence means that state borders are irrelevant to the allocation of water in subbasin 5 of Reach II, then the Oklahoma water laws at issue conflict with the cross-border rights created by federal law in the form of the Compact and must be pre-empted. But if §5.05(b)(1)'s silence instead reflects a background understanding on the part of the Compact's drafters that state borders were to be respected within the Compact's allocation, then the Oklahoma statutes do not conflict with the Compact's allocation of water.

B

Interstate compacts are construed as contracts under the principles of contract law. *Texas* v. *New Mexico*, 482 U. S. 124, 128 (1987). So, as with any contract, we begin by examining the express terms of the Compact as the best indication of the intent of the parties, see also *Montana* v. *Wyoming*, 563 U. S. \_\_\_, \_\_\_, and n. 4, \_\_\_, (2011) (slip op., at 5, and n. 4, 17); Restatement (Second) of Contracts §203(b) (1979).

Tarrant argues that because other provisions of the Compact reference state borders, §5.05(b)(1)'s silence with respect to state lines must mean that the Compact's drafters intended to permit cross-border diversions. For example, §5.03(b), which governs subbasin 3 of Reach II, provides that

> "[t]he States of Oklahoma and Arkansas shall have free and unrestricted use of the water of this subbasin *within their respective states*, subject, however, to the limitation that Oklahoma shall allow a quantity of water equal to . . . 40 percent of the total runoff origi-

_____

Supremacy Clause, Art. VI, cl. 2, then ensures that a congressionally approved compact, as a federal law, pre-empts any state law that conflicts with the Compact. See *Fidelity Fed. Sav. & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 152–153 (1982).

nating below the following existing, authorized or proposed last major downstream damsites in Oklahoma to flow into Arkansas." 1 App. 23–24 (emphasis added).

Section 6.03(b), which covers subbasin 3 of Reach III, similarly provides that "Texas and Louisiana *within their respective boundaries* shall each have the unrestricted use of the water of this subbasin subject to the following [conditions]." *Id.*, at 33 (emphasis added). Thus, §5.03(b) and §6.03(b) mimic §5.05(b)(1) in allocating water rights within a subbasin, but differ in that they make explicit reference to water use "within" state boundaries. Relying on the *expressio unius* canon of construction, Tarrant finds that §5.05(b)'s silence regarding borders is significant because "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed [that] Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Brief for Petitioner 29 (quoting *Russello* v. *United States*, 464 U. S. 16, 23 (1983)).

But Tarrant's argument fails to account for other sections of the Compact that cut against its reading. For example, §5.05(b)(3), which governs the waters of subbasin 5 in Reach II when flows are below 1,000 CFS, requires that during such periods, Arkansas, Texas, and Oklahoma allow water "*within their respective states* to flow into the Red River as required to maintain a 1,000 [CFS] flow at the Arkansas-Louisiana state boundary." 1 App. 25 (emphasis added). Obviously none of the upstream States can redirect water that lies outside of their borders, so the phrase "within their respective states" is superfluous in §5.05(b)(3). In contrast, §5.05(b)(2), which governs when the River's flow at the Arkansas-Louisiana border is above 1,000 CFS but below 3,000 CFS, requires that upstream States allow a flow to Louisiana equivalent to 40 percent

of total weekly runoff originating within the subbasin and 40 percent of undesignated water flowing into subbasin 5 of Reach II. *Id.*, at 25. This language can only refer to water within each State's borders because otherwise *each* State would have to contribute 40 percent to the total water flow, which would add up to more than 100 percent. Read together and to avoid absurd results, §§5.05(b)(2) and (3) suggest that each upstream State is individually responsible for ensuring that sufficient subbasin 5 water located *within its respective* borders flows down to Louisiana, even though §5.05(b)(2) lacks any explicit reference to state lines.

Applying Tarrant's understanding of §5.05(b)(1)'s silence regarding state lines to other of the Compact's provisions would produce further anomalous results. Consider §6.01(b). That provision states that "Texas is apportioned sixty (60) percent of the runoff of [subbasin 1 of Reach III] and shall have unrestricted use thereof; Arkansas is entitled to forty (40) percent of the runoff of this subbasin." *Id.,* at 32. Because Texas is upstream from Arkansas, water flows from Texas to Arkansas. Given this situation, the commonsense reason for §6.01(b)'s 60-to-40 allocation is to prevent Texas from barring the flow of water to Arkansas. While there is no reference to state boundaries in the section's text, the unstated assumption underlying this provision is that Arkansas must wait for its 40 percent share to go through Texas before it can claim it. But applying Tarrant's understanding of silence regarding state borders to this section would imply that Arkansas could enter into Texas without having to wait for the water that will inevitably reach it. This counterintuitive outcome would thwart the self-evident purposes of the Compact. Further, other provisions of the Compact share this structure of allocating a proportion of water that will

flow from an upstream State to a downstream one.[9]  Accepting Tarrant's reading would upset the balance struck by all these sections.

At the very least, the problems that arise from Tarrant's proposed reading suggest that §5.05(b)(1)'s silence is ambiguous regarding cross-border rights under the Compact.  We therefore turn to other interpretive tools to shed light on the intent of the Compact's drafters.  See *Oklahoma* v. *New Mexico*, 501 U. S. 221, 235, n. 5 (1991).[10]  Three things persuade us that cross-border rights were not granted by the Compact: the well-established principle that States do not easily cede their sovereign powers, including their control over waters within their own territories; the fact that other interstate water compacts have treated cross-border rights explicitly; and the parties' course of dealing.

1

The background notion that a State does not easily cede its sovereignty has informed our interpretation of interstate compacts.  We have long understood that as sovereign entities in our federal system, the States possess an

———————

[9] See Compact §4.01(b), 1 App. 18 ("The annual flow within this sub-basin is hereby apportioned sixty (60) percent to Texas and forty (40) percent to Oklahoma"); §6.02(b), *id.,* at 32 ("Arkansas is apportioned sixty (60) percent of the runoff of this subbasin and shall have unrestricted use thereof; Louisiana is entitled to forty (40) percent of the runoff of this subbasin").

[10] There is, however, one interpretive tool that is inapplicable here: the presumption against pre-emption.  The Court of Appeals repeatedly referenced and relied upon the presumption in its opinion.  See 656 F. 3d 1222, 1239, 1242, 1245–1246 (CA10 2011).  Yet the presumption against pre-emption is rooted in "respect for the States as 'independent sovereigns in our federal system'" and "assume[s] that 'Congress does not cavalierly pre-empt'" state laws.  *Wyeth* v. *Levine*, 555 U. S. 555, 565–566, n. 3 (2009).  When the States themselves have drafted and agreed to the terms of a compact, and Congress' role is limited to approving that compact, there is no reason to invoke the presumption.

"absolute right to all their navigable waters and the soils under them for their own common use." *Martin* v. *Lessee of Waddell*, 16 Pet. 367, 410 (1842). Drawing on this principle, we have held that ownership of submerged lands, and the accompanying power to control navigation, fishing, and other public uses of water, "is an essential attribute of sovereignty," *United States* v. *Alaska*, 521 U. S. 1, 5 (1997). Consequently, "'[a] court deciding a question of title to [a] bed of navigable water [within a State's boundaries] must . . . begin with a strong presumption' against defeat of a State's title." *Id.,* at 34 (quoting *Montana* v. *United States*, 450 U. S. 544, 552 (1981)). See also *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers*, 531 U. S. 159, 174 (2001); *Utah Div. of State Lands* v. *United States*, 482 U. S. 193, 195 (1987).

Given these principles, when confronted with silence in compacts touching on the States' authority to control their waters, we have concluded that "[i]f any inference at all is to be drawn from [such] silence on the subject of regulatory authority, we think it is that each State was left to regulate the activities of her own citizens." *Virginia* v. *Maryland*, 540 U. S. 56, 67 (2003). Cf. *New Jersey* v. *New York*, 523 U. S. 767, 783, n. 6 (1998) ("[T]he silence of the Compact was on the subject of settled law governing avulsion, which the parties' silence showed no intent to modify").

Tarrant asks us to infer from §5.05(b)(1)'s silence regarding state borders that the signatory States have dispensed with the core state prerogative to control water within their own boundaries.[11] But as the above demon-

_____

[11] Of course, the power of States to control water within their borders may be subject to limits in certain circumstances. For example, those imposed by the Commerce Clause. See *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941, 954–958 (1982). Here we deal only with whether the parties' silence on state boundaries in the allocation of water under a compact suggests that borders are irrelevant for that

strates, States rarely relinquish their sovereign powers, so when they do we would expect a clear indication of such devolution, not inscrutable silence. We think that the better understanding of §5.05(b)(1)'s silence is that the parties drafted the Compact with this legal background in mind, and therefore did not intend to grant each other cross-border rights under the Compact.

In response, Tarrant contends that its interpretation would not intrude on any sovereign prerogative of Oklahoma because that State would retain its authority to regulate the water within its borders. Because anyone seeking water from Oklahoma would still have to apply to the OWRB, receive a permit, and abide by its conditions, Tarrant argues that Oklahoma's sovereign authority remains untouched by its interpretation. But Tarrant cannot have it both ways. Adopting Tarrant's reading would necessarily entail assuming that Oklahoma and three other States silently surrendered substantial control over the water within their borders when they agreed to the Compact. Given the background principles we have described above, we find this unlikely to have been the intent of the Compact's signatories.

2

Looking to the customary practices employed in other interstate compacts also helps us to ascertain the intent of the parties to this Compact. See *Alabama* v. *North Carolina*, 560 U. S. 330 \_\_\_, \_\_\_ (2010) (slip op., at 9); *Oklahoma*, 501 U. S., at 235, n. 5; *Texas* v. *New Mexico*, 462 U. S. 554, 565 (1983). See also Restatement (Second) of Contracts §203(b) (explaining that "usage of trade" may be relevant in interpreting a contract). Many of these other compacts feature language that unambiguously permits

—————

allocation. As noted *infra*, at 23–24, Tarrant has not raised any Commerce Clause challenge to Oklahoma's control of the water allocated to it by the Compact.

signatory States to cross each other's borders to fulfill obligations under the compacts. See, *e.g.,* Amended Bear River Compact, Art. VIII(A), 94 Stat. 12 ("[N]o State shall deny the right of another signatory State . . . to acquire rights to the use of water . . . in one State for use of water in another").[12] The absence of comparable language in the Red River Compact counts heavily against Tarrant's reading of it.

Tellingly, many of these compacts provide for the terms and mechanics of how such cross-border relationships will operate, including who can assert such cross-border rights, see, *e.g.,* Kansas-Nebraska Big Blue River Compact, Art. VII(1), 86 Stat. 198, who should bear the costs of any cross-border diversions, see, *e.g.,* Belle Fourche River Compact, Art. VI, 58 Stat. 96–97, and how such diversions should be administered, Arkansas River Basin Compact, Kansas-Oklahoma, Art. VII(A), 80 Stat. 1411. See also Brief for Professors of Law and Political Science as *Amici Curiae* 11–14 (giving more examples).

Provisions like these are critical for managing the complexities that ensue from cross-border diversions. Consider the mechanics of a cross-border diversion or taking of water in this case. If Tarrant were correct, then appli-

_____

[12] See also Amended Costilla Creek Compact, Art. III(2), 77 Stat. 353 ("Each State grants for the benefit of the other . . . the rights . . . in one State for use in the other"); Klamath River Basin Compact, Art. V(A), 71 Stat. 500 ("Each state hereby grants for the benefit of the other . . . the right . . . in one state for use in the other"); Snake River Compact, Art. VIII(A), 64 Stat. 32 ("[N]either State shall deny the right of the other State to acquire rights to the use of water . . . in one State for use in the other"); South Platte River Compact, Art. VI(1), 44 Stat. 198 ("Colorado consents that Nebraska and its citizens may . . . divert water from the South Platte River within Colorado for use in Nebraska"); Upper Colorado River Basin Compact, Art. IX(a), 63 Stat. 37 ("[N]o State shall deny the right of another signatory State . . . to acquire rights to the use of water . . . in an upper signatory State for consumptive use in a lower signatory State").

cants from Arkansas, Texas, and Louisiana could all apply to the OWRB for permits to take water from Oklahoma. The OWRB would then be obligated to determine the total amount of water in Oklahoma beyond the 25 percent cap created in §5.05(b)(1), given that the Compact would only obligate Oklahoma to deliver water beyond its quarter share. This alone would be a herculean task because the Compact does not require ongoing monitoring or accounting, see Compact §2.11, 1 App. 13, and not all of the water in subbasin 5 is located or originates in Oklahoma. Moreover, the OWRB would be tasked with determining the priority under the Compact of applicants from other States. This would almost certainly require the OWRB to not only determine whether Oklahoma had received more or less than its 25 percent allotment, but whether other States had as well. Put plainly, the end result would be a jurisdictional and administrative quagmire. The provisions in the other interstate water compacts resolve these complications. The absence of comparable provisions in the Red River Compact strongly suggests that cross-border rights were never intended to be part of the States' agreement.

Tarrant counters that not all interstate compacts that permit cross-border diversions have explicit language to this effect. On this front, Tarrant manages to identify one interstate compact that it contends permits cross-border diversions without express language to that effect, the Upper Niobrara River Compact, Pub. L. 91–52, 83 Stat. 86. Tarrant observes that this compact, which deals with a river mostly located in Nebraska with only a small portion in Wyoming, provides that "[t]here shall be no restrictions on the use of the surface waters of [the river] by Wyoming." See Art. V(A)1, *id.*, at 88. Tarrant suggests that this language, coupled with the fact that the bulk of the river is in Nebraska, implicitly indicates that the compact grants Wyoming a right to enter Nebraska and

use the river's water. First, we are not convinced that a single compact's failure to reference state borders does much to detract from the overall custom in this area. See *supra,* at 16–18, and n. 12. Second, the Upper Niobrara River Compact is not a helpful counterexample for Tarrant. The general provision that Tarrant quotes is paired with a host of detailed conditions. See Arts. V(A)1(a)–(f), 83 Stat. 88. Contrary to Tarrant's position, then, assuming that the Upper Niobrara River compact does create any cross-border rights, it does so not through silence, but through the detailed scheme that would apply to any such contemplated diversions.

Tarrant also argues that §2.05(d) of the Red River Compact, which provides that "[e]ach Signatory State shall have the right to" "[u]se the bed and banks of the Red River and its tributaries to convey stored water, imported or exported water, and water apportioned according to this Compact," 1 App. 11, in fact authorizes cross-border diversions. Because the present border between Texas and Oklahoma east of the Texas Panhandle is set by the vegetation line on the south bank of the River, Red River Boundary Compact, 114 Stat. 919, Tarrant contends that §2.05(d) reflects an understanding on the part of the Compact's drafters that state borders could be crossed. But the issue is not as simple as Tarrant makes it out to be. When the Compact was drafted, the Texas-Oklahoma border was fixed at the south bank of the River. See *Texas* v. *Oklahoma*, 457 U. S. 172 (1982). If Texas was able to access water through the south bank of the River—an issue left unbriefed by the parties—the Compact's framers may have believed that Texas could reach the River and take water from it without having to enter Oklahoman land, casting doubt on Tarrant's theory. In any event, even if §2.05(d) is read to establish a cross-border right, it does so through express language setting forth the location and purposes under which such an incursion is permissible.

This is different from the inference from silence that Tarrant asks us to draw in §5.05(b)(1).

### 3

The parties' conduct under the Compact also undermines Tarrant's position. A "part[y's] course of performance under the Compact is highly significant" evidence of its understanding of the compact's terms. *Alabama* v. *North Carolina*, 560 U. S., at___ (slip op., at 14). Since the Compact was approved by Congress in 1980, no signatory State had pressed for a cross-border diversion under the Compact until Tarrant filed its suit in 2007. Brief for Respondents 26, 49–51. Indeed, Tarrant attempted to purchase water from Oklahoma over the course of 2000 until 2002, see *supra,* at 7, a strange offer if Tarrant believed it was entitled to demand such water without payment under the Compact.

In response, Tarrant maintains that there were "compelling business reasons" for it to purchase water. Reply Brief 17. We are unpersuaded. If Tarrant believed that it had a right to water located in Oklahoma, there would have been "compelling business reasons" to mention this right given that billions of dollars were at stake. See 2 App. 362–363 (summarizing Texas purchase proposal). Yet there is no indication that Tarrant or any other Texas agency or the State of Texas itself previously made any mention of cross-border rights within the Compact, and none of the other signatory States has ever made such a claim.

### 4

The Compact creates no cross-border rights in Texas. Tarrant's remaining arguments do not persuade us otherwise.

First, Tarrant argues that its interpretation of the Compact is necessary to realize the "structure and purpose

of Reach II." Brief for Petitioner 34–38. Tarrant contends that because the boundary of subbasin 5 is set by the location of the last existing, authorized, or proposed sites for a downstream dam before the Red River, see Compact §§5.01(a), 5.02(a), 5.03(b), 5.04(a), 1 App. 22–24, the Compact allows each of the States upstream from Louisiana to prevent water from flowing from its tributaries into subbasin 5. Tarrant reasons that each State will therefore hold whatever water it needs in its upstream basins. Given this, Tarrant maintains that any water that a State voluntarily allows to reach subbasin 5 must be surplus water that State did not intend to use, and if the upstream State has no need for that water, then there is no reason not to allow other States to access and use it, even across borders.

This argument is founded on a shaky premise: It assumes that flows from these dammed-up tributaries are the sole source of water in subbasin 5. But §5.05(b)(1) explains that "[s]ignatory States shall have equal rights to the use of runoff originating in subbasin 5," as well as "water flowing into subbasin 5," which would include flows from the main stem of the River itself. *Id.*, at 25. Thus, there are waters that are specific to subbasin 5 separate from those originating in the tributaries covered by subbasins 1 through 4. Tarrant's account of the purposes of subbasin 5 does not explain how these waters were to be allocated.

Tarrant's second argument regarding the purposes of Reach II is that §5.05(b)(1)'s 25 percent cap on each State's access to excess water in subbasin 5 should be read to imply that if a State cannot access sufficient water within its borders to meet its share under the cap, then it must be able to cross borders to reach that water. Were it otherwise, Tarrant explains, the 25 percent cap would have no purpose. To support this argument, Tarrant draws on a 1970 engineering report that it contends shows that only

16 percent of the freshwater flowing into subbasin 5 was located in Texas. Brief for Petitioner 9, n. 5. The OWRB challenges this percentage with its own calculations drawn from the report, and asserts that Texas had access to at least 29 percent of the excess water in subbasin 5 within its own borders. Brief for Respondents 26, 47–48, and n. 17.

Fortunately, we need not delve into calculations based on a decades-old engineering report to resolve this argument. As we have explained, *supra,* at 4–6, Texas does not have a minimum guarantee of 25 percent of the excess water in subbasin 5. If it believes that Oklahoma is using more than its 25 percent allotment and wishes to stop it from doing so, then it may call for an accounting under §2.11 of the Compact and, depending on the results of that accounting, insist that Oklahoma desist from taking more than its provided share. See Compact §2.11, and Comment on Art. II, 1 App. 13–16. This is the appropriate remedy provided under the Compact. But Texas has never done so and Tarrant offers no evidence that in the present day Texas cannot access its 25 percent share on its own land.

C

Under the Compact's terms, water located within Oklahoma's portion of subbasin 5 of Reach II remains under Oklahoma's control. Accordingly, Tarrant's theory that Oklahoma's water statutes are pre-empted because they prevent Texas from exercising its rights under the Compact must fail for the reason that the Compact does not create any cross-border rights in signatory States.

III

Tarrant also challenges the constitutionality of the Oklahoma water statutes under a dormant Commerce Clause theory. Tarrant argues that the Oklahoma water

statutes impermissibly "'discriminat[e] against interstate commerce' for the 'forbidden purpose' of favoring local interests" by erecting barriers to the distribution of water left unallocated under the Compact.  Brief for Petitioner 47–48 (quoting *Department of Revenue of Ky.* v. *Davis,* 553 U. S. 328, 338 (2008)).  Tarrant's argument is premised on the position that if we "adopt the Tenth Circuit's or respondent's interpretation [of the Compact], . . . a substantial amount of Reach II, Subbasin 5 water located in Oklahoma is not apportioned to *any* State and therefore is available to permit applicants like Tarrant."  Brief for Petitioner 47.  So, Tarrant continues, because Oklahoma's laws prevent this "unallocated water" from being distributed out of State, those laws violate the Commerce Clause.

Tarrant's assumption that that the Compact leaves some water "unallocated" is incorrect.  The interpretive comment for Article V of the Compact makes clear that when the River's flow is above 3,000 CFS, "all states are free to use whatever amount of water they can put to beneficial use," subject to the requirement that "[i]f the states have competing uses and the amount of water available in excess of 3000 CFS cannot satisfy all such uses, each state will honor the other's right to 25% of the excess flow."  1 App. 29–30.  If more than 25 percent of subbasin 5's water is located in Oklahoma, that water is not "unallocated"; rather, it is allocated to Oklahoma unless and until another State calls for an accounting and Oklahoma is asked to refrain from utilizing more than its entitled share.[13]  The Oklahoma water statutes cannot discriminate against interstate commerce with respect to unallocated waters because the Compact leaves no

––––––––––

[13]Moreover, even if Oklahoma utilized less than 25 percent of the excess subbasin 5 water within its territory and allowed the rest to flow down the River, that water would pass from Reach II into Reach V, see Compact §2.12, 1 App. 13, the waters of which are completely allocated to Louisiana, §8.01, *id.,* at 38.  Again, no water is left "unallocated."

waters unallocated. Tarrant's Commerce Clause argument founders on this point.

\*      \*      \*

The Red River Compact does not pre-empt Oklahoma's water statutes because the Compact creates no cross-border rights in its signatories for these statutes to infringe. Nor do Oklahoma's laws run afoul of the Commerce Clause. We affirm the judgment of the Court of Appeals for the Tenth Circuit.

*It is so ordered.*

# APPENDIX A



Map of Reach II. Brief for Respondent 33a.

# APPENDIX B



Map of the Red River Compact. Brief for Respondent 34a.