76 A.3d 1001

The TOWN OF LA PLATA, et al.

v.

FAISON–ROSEWICK LLC, et al.

No. 68, Sept. Term, 2012.

Court of Appeals of Maryland.

Sept. 25, 2013.

498

Frederick C. Sussman (Brian T. Gallagher of Council, Baradel, Kosmerl & Nolan, P.A., Annapolis, MD), on brief, for appellants/cross-appellees.

Maury S. Epner (Miller, Miller & Canby, Chtd., Rockville, MD; Traci R. Scudder of the Law Office of Traci R. Scudder, LLC, Bowie, MD), on brief, for appellants/cross-appellees.

Michael D. Berman (Rifkin, Livingston, Levitan, and Silver, LLC, Bethesda, MD, on brief), for appellees/cross-appellants.

Sue A. Greer (The Greer Law Firm, La Plata, MD), on brief, for appellees/cross-appellants.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, and BELL,* JJ.

GREENE, J.

The ultimate issue presented by this case is what may be placed on a petition for referendum pertaining to land annexation under Maryland Code (1957, 2011 Repl.Vol.), Article

---

\* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of the Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

23A, § 19(g).[1]  Additionally, the parties present questions regarding a Town Manager's[2] authority to create procedures for the validation and verification of signatures on a referendum petition, whether the administrator in this particular case observed his own procedures, and to what extent, if any, the Election Law Article of the Maryland Code and Maryland common law should apply to municipal land annexation referenda.

We shall hold that a petition for referendum, pertaining to land annexation, shall present foremost a land annexation resolution, but the inclusion of additional legislative enactments that, although non-referable, do not obfuscate the subject matter of the petition for referendum, will not invalidate the petition.  *See* Maryland Code (1957, 2011 Repl.Vol.), Article 23A, § 19(g), (o); *Koste v. Town of Oxford*, 431 Md. 14, 63 A.3d 582 (2013); *Anne Arundel Cnty. v. McDonough*, 277 Md. 271, 354 A.2d 788 (1976).  Moreover, we hold that the chief executive and administrative officer in the present case acted within his authority when he published Town policies for the validation and verification of signatures on a petition for referendum.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 27, 2011, the La Plata Town Council passed four resolutions, one of which was an annexation resolution acquiring a 14.1 acre tract of land.  The annexed land consisted of a 4.1 acre right-of-way along Route 301, and a ten-acre parcel owned by one of the Appellees in this case, Johel

---

1.  On April 9, 2013, the General Assembly recodified Article 23A, § 19 as Local Government Article, § 4–401 *et seq.*, effective October 1, 2013. The new language is derived without substantive change from Article 23A, § 19.  For the purposes of the present case, however, we will refer to the statute as it existed at the time of the underlying incident.

2.  Under the Charter of the Town of La Plata, a "Town Manager" is an officer of the Town appointed by the Town Council that assumes the role of "Chief Executive Officer and the head of the administrative branch of the town government."  *See* Town of La Plata Charter, § C5–1, § C5–5(A), § C4–3(A) (2008).

Limited Partnership (hereinafter, "Johel"). The annexed land was intended as the site to erect a Wal–Mart store and other retail and office spaces. This annexation resolution, Resolution No. 11–12a, passed by a vote of 3–2. The other Resolutions, 11–11 a (approving a 2011 annexation agreement to the extent it set out certain conditions under which the Town agreed to consider the 2011 annexation), 11–13 (approving an annexation plan as required under Article 23A, § 19(*o*) containing the Town Manager's analysis of the consequences of the annexation with regard to Town services such as water and sewer), and 11–14a (approving an amendment to an earlier annexation agreement) all passed by a unanimous vote of the Town Council.

Thereafter, several citizens of La Plata and other interested persons (hereinafter, "the Referendum Supporters"), Appellants in this case, published and circulated a petition to refer the Town Council's annexation resolution to referendum. *See* Article 23A, § 19(g) of the Maryland Code (describing the municipal annexation referenda process) (hereinafter, all references to Art. 23A, Section 19 of the Code will be cited as "§ 19"). The petition signature page stated:

We, the undersigned voters of the Town of La Plata, hereby petition to refer Resolutions No. 11–11 a Approval of Annexation Agreement and Amendment to Existing Annexation Agreement; No. 11–12a Johel Limited Partnership and FCD–Development, LLC Annexation—14.111 Acres; No. 11–13 Johel Limited Partnership and FCD Development, LLC Annexation Plan—14.111 Acres; No. 11–14a Amendment of the Rosewick Annexation Agreements adopted September 27, 2011 to a vote of the registered voters of the Town of La Plata for approval or rejection at the earliest election. If the full text of the bill/ordinance or part of the bill/ordinance referred (the "proposal") does not appear on the back of the signature page or as an attachment, a fair and accurate summary of the substantive provisions of the proposal must appear on the back or be attached, and the full text of the proposal must be immediately available from the petition circulator.... By signing

this petition, you agree that the aforementioned proposal should be placed on the ballot as a referendum question at the next general election....

On November 8, 2011, several days before the petition signature pages were due for filing with the chief executive and administrative officer of La Plata, Town Manager Daniel Mears ("Mears"), published on the Town's website an eight-page document entitled "Procedures for Validation and Verification of Signatures on Annexation Referendum Petition Signatures Submitted Pursuant to Maryland Annotated Code, Article 23A, Section 19(g)" ("procedures"). The procedures established the process and criteria to guide the Town Manager in validation and verification of signatures on a petition for the purpose of submitting the annexation question to the voters. Included in the procedures are guidelines on the filing, acceptance and preliminary review of the petitions, signature removal, signature validation and reporting results. For example, with regard to the filing, acceptance and preliminary review of petitions, the procedures note that if the Town Manager determines that the petition form is not legally sufficient, he or she will reject the petition. Alternatively, if the form of the petition is determined to be legally sufficient, or if "the Town Manager determines that the legal sufficiency of the petition cannot reasonably be determined ... but that verification of the petition is in the interest of the orderly management of the election and referendum process," the Town Manager will begin to validate the signatures. The procedures also contain a provision allowing the Town Manager to reserve the right to modify the procedures on an as-needed basis.

On November 10, 2011, the Referendum Supporters submitted their petition for referendum to Mears. Thereafter, Mears conducted an initial review regarding the legal sufficiency of the form of the petition. Early in his review, Mears requested assistance from counsel for the interested parties as to whether the petition was invalid on its face because its signatories sought to petition to referendum four resolutions

when only one of the resolutions was referable. On December 30, 2011, Mears responded:

> ... Based upon these collective arguments and views, no judicial precedent has been cited to me that definitively answers the question that I posed. Based upon review of the case law and relevant statutes and the arguments submitted by counsel, my best assessment is that the form of the petition is not legally sufficient.
>
> However, because the matter is not free from doubt, I have concluded that the judicial system is the more appropriate forum to resolve this question if and when a person with standing chooses to file a lawsuit at the appropriate time. In the meantime, I shortly will begin the process of reviewing, validating and verifying the signatures on the petition sheets. Any further determinations regarding the petition and a referendum election will be made after the conclusion of the signature validation and verification process.

Subsequently, both Mears and the Charles County Board of Elections [3] separately reviewed the referendum petition pages. Following the reviews, Mears issued a thirteen-page document entitled "Report of Johel Annexation Petition Referendum Review," in which he concluded that "[t]he petition for referendum contained the legally sufficient signatures of more than 20% of individuals qualified to vote in Town elections." The report also noted, however, that "[s]ignificant questions remain regarding the legal sufficiency of the petition as submitted, and the implications of possible irregularities and improprieties in the petition circulation and signature gathering process that do not violate clear principles of Maryland statutory or case law." Mears noted, however, that "[t]he judicial system is the more appropriate forum to resolve these legal questions if and when a person with standing chooses to file a lawsuit."

---

**3.** According to Mears's procedures, the validation and verification of signatures is "to be conducted by the Charles County Board of Elections, the Town staff, or a combination of these."

On March 13, 2012, the Town, through Mears, issued a proclamation stating that sufficient signatures had been submitted. As such, the annexation resolution was suspended, and all four resolutions were referred to referendum. The Town then drafted a referendum ballot for an election to be held on April 18, 2012, asking the citizens of La Plata to approve or reject "all four Resolutions." [4]

Appellees, Faison–Rosewick, LLC, FCD–Development, LLC, John D. Mitchell, III, John Latimer, Sandra L. Latimer, and Johel, a group consisting of voters and taxpayers of the Town, and "some selling landowners and out-of-state contract purchasers and developers" (hereinafter, collectively, "the Referendum Opponents"), filed in the Circuit Court for Charles County a "Petition or Complaint for Judicial Review" of Mears's report validating the signatures and advancing the referendum to a vote. The Town, also an Appellant, moved to dismiss the Referendum Opponents' judicial review petition. The Referendum Opponents then filed an "Amended Petition for Judicial Review; [an] Amended Complaint for Declaratory and Injunctive Relief, and for Administrative Mandamus." At that point, the Referendum Supporters filed a motion to intervene, and thereafter filed legal memoranda, a motion to dismiss, and a motion for summary judgment. The Circuit Court held a scheduling conference on March 27, 2012, where it enjoined the election, set a schedule for full resolution of the case, and ordered that no discovery be permitted. On April 2, 2012, the Referendum Opponents filed an "Amended Petition for Judicial Review; and, a Second Amended Complaint by Interlineation for Declaratory and Injunctive Relief, for Administrative Mandamus, and Mandamus," which essentially added a count for common law mandamus. Additionally, on April 9, 2012, the Circuit Court granted the Referendum Supporters the conditional right to intervene.

---

4. The Town, thereafter, published notices of the referendum election in local newspapers beginning on March 16, 2012. *See* § 19(i) (requiring that the referendum election date be between fifteen and ninety days "from the publication of notices therefor").

On May 3, 2012, a judge of the Circuit Court heard argument and announced from the bench his ruling in favor of the Referendum Opponents. The trial judge later issued a written order and opinion.[5] The judge's opinion first discussed whether all of the resolutions could be placed on the petition. The trial judge opined:

Case law is clear that whether it's an ordinance or an annexation, as in this case, there should be only one subject. Many cases involve statutes that have more than one subject, then they're struck down; if they do contain more than one subject, then it's because of a failure to competently notify the public as to the subject of the particular ordinance. The Court need not rule on this issue.

The trial judge also reviewed the referendum process. He noted that the dispositive issue in this case "deals with the guidelines ... that the Town Manager put together two days before the petition had to be filed." According to the trial judge, while § 19(g) is clear in terms of granting the Town Manager the responsibility and duty of verifying the signatures and ascertaining that the signatures reflect 20% of the qualified voters, the statute does not tell the Town Manager *how* to do it. The trial judge concluded that Mears put together guidelines for the voters, that would, in effect, "give him *carte blanche* approval in determining his responsibility, namely the verification of the petitions."

After explaining that the court is "required to uphold the administrative decision[ ] as long as [it] is not arbitrary, capricious or illegal," the trial judge found that Mears did not have the power to determine his own verification process under the statute. Rather, according to the trial judge, "[t]hat's an action that the Town could have done in exercising its governmental power, but it never did so ... [and] [t]his was a non-delegable governmental power." Moreover, according to the court, Mears did not have the implied power to create these verification procedures because "[a]n act of this

---

**5.** A modified order to correct a typographical error was docketed on June 6, 2012.

nature which impacts on the election process can hardly be considered ministerial ... [i]t's up to the Town to promulgate its own guidelines in a matter of this importance ... [a]nd I don't think [Mears] ... had the right to publish the guidelines on his own." Finally, the court explained that

[the guidelines] were published too late to establish the rules of the road for this petition. Filing the rules ... two days before the final petition was required to be filed makes no sense to me and is an error of law, a violation of any due process that should give the public the notice that it deserves ... and to make such a proposal known to it. It was never done. The failure to do so taints this whole process.... I note that [Mears] himself, abandoned some of his own procedures after the guidelines were adopted ... [also] evidence discloses that after the guidelines were published, [Mears] felt that the form of the petition for referendum was not legally sufficient, but was not his call, ultimately. So accordingly ... the Petition for Referendum is flawed and therefore has to fail.

Thereafter, the Town and Referendum Supporters appealed to the Court of Special Appeals, and Referendum Opponents cross-appealed. The Referendum Opponents filed a petition for certiorari to this Court, and the Town and Referendum Supporters filed cross-petitions, all of which were granted prior to any proceedings in the intermediate appellate court. *Town of La Plata v. Faison–Rosewick, LLC,* 428 Md. 543, 52 A.3d 978 (2012). We have rephrased the underlying questions posed by the parties for purposes of brevity and clarity:[6]

---

**6.** The petition for certiorari and cross-petitions raised the following questions: (1) Did the Circuit Court correctly determine that the Town's "procedures," promulgated two days before the signature pages were filed, were untimely, *ultra vires,* facially-invalid, improperly "abandoned" by the Town, and that the entire referendum process was tainted by those errors? (2) Because the referendum petition under Art. 23A, § 19(g), and the ballot under § 19(j), cannot include the three Non–Referable Resolutions, did the Town err in permitting verification of signatures to proceed on the legally insufficient pages, and including the Non–Referable Resolutions on the proposed ballot, while failing to make the mandatory finding that the pages complied with Art. 23A,

1. Whether the referendum petition is invalid under Article 23A, § 19(g) because it includes, in addition to the land

§ 19? (3) Given the lack of detail in Art. 23A, § 19(g), regarding verification of signatures on municipal referenda, and in light of *Cumberland* and *Tyler*, should this Court apply State-based common law to protect the integrity of this municipal referendum process, where there was documented and pervasive misfeasance by those who advanced the referendum and obtained supporting signatures? (4) Can the Town of La Plata challenge its own Resolutions on this appeal under the principles set forth in *Burning Tree?* (5) On what basis did the circuit court properly have subject matter jurisdiction to hear the petitioners' challenge here? (6) What is the appropriate standard of appellate review? (7) Did the circuit court correctly conclude that the La Plata town manager acted beyond his authority when he, rather than the La Plata Town Council, published the criteria he applied to verify and validate petition signatures and he did so two days before the deadline for the submission of those signatures? (8) Even if the town manager acted beyond his authority, does that *ultra vires* act thereby warrant invalidating the petition, precluding the referendum election, and thereby punishing the citizens of LaPlata who were blameless in the matter? (9) Whether the referendum petition and ballot are invalid because, in addition to seeking a referendum on the Town Council's annexation resolution, they also mention three other resolutions, all inextricably related to the annexation resolution, all concerning the identical subject matter, all passed on the same day as the annexation resolution, and all lacking any vitality independent of the annexation resolution itself? (10) Whether, despite the clear inapplicability of the Maryland Election Code to the municipal referendum at issue in this case, the court should nevertheless have invalidated that referendum because La Plata's petition verification procedures did not in every respect mimic those required by the Maryland Election Code? (11) Since Art. 23A, § 19(g), imposed on Mears, as the Town's chief executive and administrative officer, the mandatory duty to verify signatures on an annexation petition without directing or guiding Mears how to perform that duty, did Mears have implied authority to use any reasonable means to fulfill that duty, including the promulgation of written procedures to assist him, without the need for authorizing legislation by the Town Council? (12) Since Mears'[s] written procedures were intended to assist him in the receipt, safeguarding, review and verification of annexation referenda petitions, did his promulgation of the procedures two days before a petition for referendum was submitted to him violate any due process rights of Plaintiffs or the public at large? (13) Should this Court apply Maryland common law relating to referendum petitions, developed under the Election Law Article and it's predecessors, to municipal annexation referenda when the Election Law Article expressly excludes from its scope elections conducted and petitions filed under Article 23A, and where the record in the Circuit Court does not establish, much less even address, any change in circumstances or conditions since Article 23A, § 19, was enacted after the establishment of municipal Home Rule by the adoption of Article XI-E of the Maryland Constitution in 1954?

annexation resolution, three other non-referable, but related resolutions?

2. Under Article 23A § 19(g), does the Town Manager, rather than the Town Council, have the authority to publish petition verification criteria?

3. To what extent, if any, is State-based common law and the Election Law Article applied to the municipal petition verification process in Article 23A, § 19(g)?

We hold that the statute allows for a "petition ... for a referendum on the resolution." Article 23A, § 19(g). The statutory scheme clarifies that the resolution refers to a decision that adds to the corporate boundaries of the municipal corporation. We hold, however, that where the petition for referendum contained legislative enactments that were collateral to the land annexation resolution but did not obfuscate the subject matter of the petition for referendum, such additions do not invalidate the petition. Additionally, we hold that Mears, the Town Manager of La Plata, acted within his authority as Town Manager when he published Town policies for the validation and verification of signatures on a petition for referendum, and that there was no violation of due process when those policies were published several days prior to the petition deadline.

## DISCUSSION

### I.

■ We address first the Parties [7] preliminary legal questions raised in their briefs.' For instance, the Referendum

---

7. We note that the Referendum Opponents moved to dismiss the Town's and Referendum Supporters' appeals as moot pursuant to Md. Rules 8–602(a)(10) and 8–603(c). They argue that Article 23A, § 19(i) uses mandatory language requiring that the referendum election take place between fifteen and ninety days after the publication of election notices. In this case, they argue, the expiration date for such an election was June 21, 2012. From the facts presented by the parties, however, it appears that both the Resolution's implementation and the referendum election are pending the outcome in this case, based on the trial court's

Opponents contend that the Town may not bring this challenge before this Court because doing so is an indirect attack against the four resolutions it enacted. The Referendum Opponents cite *Harford Cnty. v. Schultz*, 280 Md. 77, 371 A.2d 428 (1977), and *State v. Burning Tree Club, Inc.*, 301 Md. 9, 481 A.2d 785 (1984), two cases where we held that government officials could not directly attack the validity of their own duly enacted legislation. In *Schultz*, the County Council proposed a charter amendment that passed over the County Executive's veto and went to the Elections Board for submission to the voters. The County then brought an action against the Board to have the bill declared invalid. We noted the peculiarity of an "attack on the validity of [an] ordinance . . . by the political subdivision which enacted it," holding that the lack of a controversy made the issue non-justiciable. *Schultz*, 280 Md. at 85–86, 371 A.2d at 432–33. Similarly, in *Burning Tree*, we held that the Attorney General could not challenge the constitutionality of a law passed by the General Assembly because part of his duty as "lawyer of the State" is to defend and protect the State's policies. 301 Md. at 34, 481 A.2d at 797.

The present case bears little resemblance to *Schultz* or *Burning Tree*. Namely, this action deals with the petition for referendum and petition verification process, not the actual resolutions themselves. Moreover, the Town is defending, not challenging, what it believes is its administrator's duty under Article 23A, § 19 with regard to the petition verification and referendum process. Therefore, the Town is not challenging

---

March 27, 2012 scheduling order that enjoined the election. Moreover, while Article 23A, § 19(i) provides that an election on a petition for referendum must be held between fifteen and ninety days from publication of the notice of referendum, § 19 does not expressly prohibit republication and rescheduling of the referendum election. Meanwhile, the effectiveness of the resolution is suspended, "contingent upon the results of the referendum." Art. 23A, § 19(h). Accordingly, the issue is not moot and there exists an actual controversy. We therefore deny the motion and address the validity of the petitions as filed along with the preliminary legal questions presented. *See e.g., Burruss v. Bd. of Cnty. Comm'rs of Frederick Cnty.*, 427 Md. 231, 239 & n. 7, 46 A.3d 1182, 1186 & n. 7 (2012) (denying a motion to dismiss and addressing the merits of the election law case).

its own laws and the principles of *Burning Tree* are not at issue.

Next, we review the Referendum Supporters' jurisdictional challenge. The Referendum Supporters contend that the trial court did not have subject matter jurisdiction to review Mears's determination. They argue that the pleadings filed for judicial review, administrative and common law mandamus, must be considered by a tribunal with "the requisite legal authority to hear those questions...." The Referendum Supporters contend that the trial court "lacked the power to hear [the Referendum Opponents'] challenges as anything other than a 'properly framed' complaint for declaratory judgment" and that the claims should have been dismissed.

The Referendum Opponents filed, in addition to a complaint for judicial review, requests for declaratory relief, injunctive relief, and mandamus. Although the Circuit Court decided the merits as a judicial review action, the parties do not identify any statute or ordinance that grants a right to seek judicial review in this case.[8] This fact does not end the discussion of the Circuit Court's jurisdiction in this case, however. Rather, this Court has held that mandamus and/or injunctive relief are also appropriate avenues for reviewing and correcting an arbitrary or unreasonable agency decision where no statute or local ordinance provides the right to seek

---

8. This case followed an unusual procedural path in the trial court. As noted earlier, there were multiple motions to dismiss and motions for summary judgment pending before the court as of the March 27, 2012 scheduling order and as of the May 3, 2012 argument. The docket entries show no order disposing of these motions, nor is there any mention of the motions in the May 3, 2012 transcript. Except for a passing reference in the Referendum Supporters' initial brief to this Court ("On May 3, 2012, without deciding the motions to dismiss, the court reached the merits ...."), no party complained to this Court about the failure to address the lingering motions. For that reason, we assume there is no dispute before us as to the leaping over of the motions and deciding the cases on the merits as a judicial review action. In its May 11, 2012 Written Opinion, the Circuit Court noted that the parties agreed apparently to this type of review, stating that "[t]he Court's role in these kind of cases is as everyone agrees one of judicial review."

judicial review.   *See Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73, 76 (1945) (noting that "[c]ourts have the inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts").

Generally, mandamus is initiated as an "original action .... used 'to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party applying for the writ has a clear legal right.' " *Goodwich v. Nolan,* 343 Md. 130, 145, 680 A.2d 1040, 1047 (1996) (citation omitted); *see also Talbot Cnty. v. Miles Point Prop., LLC,* 415 Md. 372, 394, 2 A.3d 344, 357 (2010) (acknowledging "the concept of administrative mandamus as an extension of the common law writ of mandamus") (citations omitted).   Two types of mandamus are available as equitable remedies to an individual challenging the decision of an administrative agency:   common law mandamus and administrative mandamus. Administrative mandamus is limited to quasi-judicial agency actions.   *See Talbot Cnty.,* 415 Md. at 394, 2 A.3d at 357 (noting that "for administrative mandamus to lie in any given case, the underlying action being reviewed must be quasi-judicial in nature, where quasi-judicial action is synonymous with administrative adjudication").   Administrative mandamus is not an available remedy to the Referendum Opponents in this case, because Mears was not engaged in adjudicating any dispute.

On the other hand, a common law mandamus action is appropriate where "the relief sought involves the traditional enforcement of a ministerial act (a legal duty) by recalcitrant public officials," but not where there is any "vestige of discretion" in the agency action or decision.   *South Easton Neighborhood Ass'n v. Town of Easton,* 387 Md. 468, 477 n. 3, 876 A.2d 58, 63 n. 3 (2005).   "Ministerial acts are 'duties in respect to which nothing is left to discretion [and are] distinguished from those [allowing] freedom and authority to make decisions

and choices.' " *Talbot Cnty.*, 415 Md. at 397, 2 A.3d at 359 (quoting *State, Use, Clark v. Ferling*, 220 Md. 109, 113, 151 A.2d 137, 139 (1959)).

*Gisriel v. Ocean City Board of Supervisors of Elections*, 345 Md. 477, 693 A.2d 757 (1997) provides a relevant example of the types of actions that are considered in such an analysis. In *Gisriel*, a registered voter of Ocean City sought to compel the Board of Elections to comply with the Ocean City Charter voter qualification terms and procedures for validating referendum petitions, after the City Council had allegedly improperly refused to validate the petition based on an insufficient number of signatures. This Court noted that, "whenever a referendum petition is filed, ... the Board must determine whether or not such registered voters are unqualified, and delete the names of those found to be unqualified" before making a determination on the validity of the petition, and that "this is a ministerial duty imposed as a matter of law .... [and] is an appropriate subject for a common law mandamus action." *Gisriel*, 345 Md. at 498, 693 A.2d at 767–68.

Similarly, in this case, Mears and the Town's review and decision to approve the petition for referendum were actions taken pursuant to the ministerial duty of determining the validity of a petition for referendum under Article 23A, § 19(g). Additionally, Mears's published procedures were intended to further the requirements of § 19(g). Therefore, common law mandamus is an available remedy for the Referendum Opponents in this case.

Although the Circuit Court characterized the case as an action for judicial review, this Court in *Gisriel* pointed out that, "even where a particular action against an administrative agency was allegedly brought under a statutory judicial review provision ... this Court has looked to the substance of the action, [holding] that it could be treated as a common law mandamus or certiorari action, and has exercised appellate jurisdiction." *Gisriel*, 345 Md. at 500, 693 A.2d at 768. The common law mandamus action, therefore, may serve as a basis for this Court's exercise of appellate jurisdiction. *See id.*

(explaining that where the action was "in substance a common law mandamus action, the Court of Special Appeals had jurisdiction to entertain the appeal under § 12–301 of the Courts and Judicial Proceedings Article").

In addition to common law mandamus, the Referendum Opponents specifically invoked the Declaratory Judgment Act in their amended complaint.[9] Generally, the Referendum Opponents asked that the court declare that "the referendum election cannot be held based on [this petition]." [10] As such, the Referendum Opponents properly invoked the original jurisdiction of the Circuit Court, sitting in Charles County, to hear and decide the issues raised in the application for declaratory judgment. Therefore, in our review of the case, the trial judge had, at least in substance, original jurisdiction to decide this case based on the request for declaratory judgment, or in the alternative, a common law mandamus action. Accordingly, we review the trial judge's legal conclusion that the petition was flawed as a final judgment entered in the Circuit Court.[11]

---

9. The Declaratory Judgment Act provides jurisdiction for a Circuit Court to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." Md.Code (1974, 2013 Repl.Vol.), § 3–403(a) of the Courts and Judicial Proceedings Article ("CJP"). The Act states that it is "remedial . . . [intended] to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations . . . [and is to be] liberally construed and administered." CJP § 3–402. Specifically, the court may grant a declaratory judgment if it will terminate the justiciable controversy. *See Boyds Civic Ass'n v. Montgomery Cnty. Council*, 309 Md. 683, 690, 526 A.2d 598, 601 (1987) (citations and quotations omitted) (noting that a controversy is justiciable when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded); *see also* CJP § 3–409(a).

10. In the amended complaint, the Referendum Opponents challenged as "clearly erroneous [the] decision of the Town to place a referendum question on the ballot for a special election, notwithstanding[ ] the Town's 'best assessment' that the [petition] signature pages are facially invalid . . . egregious misconduct in signature gathering . . . [and signature validation,] . . . and the use of 'Procedures' [by Mears] that were invalid and prejudicial."

11. Although the Circuit Court reviewed the case under its power of judicial review and determined that the petition was flawed, we note

Specifically, we review the legal question of whether a valid petition "for a referendum on the resolution" was submitted under Article 23A, § 19(g). Additionally, we review whether, under § 19(g), the Town Manager had the authority to promulgate referendum validation procedures for the Town.

## II.

The question of the sufficiency of the petition for referendum turns on the construction and interpretation of Md.Code (1957, 2011 Repl.Vol.), Article 23A, § 19(g). The issue is what did the General Assembly intend to be presented to the voters in a petition for referendum under § 19(g).

The Referendum Opponents argue that the petition pages were legally insufficient and that the Town Manager did not verify that they complied with Article 23A, § 19. As a result, they contend, the invalid petition and petition process rendered the referendum effort in the instant case fatally flawed. First, the Referendum Opponents assert, as a matter of law, that the signature pages were not a "petition" under Article 23A, § 19. They argue that the statute is a precise rubric and authorizes a petition for referendum only on an annexation resolution. In the present case, however, the Referendum Opponents contend that the petition submitted to voters contained non-referable resolutions. Additionally, the resolutions

---

that the judge discussed issues raised in the declaratory judgment complaint and that his holding also served to terminate the uncertainty or controversy between parties. *See* CJP § 3–409(a) (noting that if an actual controversy exists between contending parties, a court may grant declaratory relief if it will serve to terminate the uncertainty or controversy). Moreover, we have consistently reiterated that "[w]hen a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, the trial court must render a declaratory judgment." *120 W. Fayette St., LLLP v. Mayor of Baltimore,* 407 Md. 253, 273, 964 A.2d 662, 673 (2009). "This Court, in its discretion, may review the merits of the controversy and remand for entry of an appropriate declaratory judgment by the circuit court[ ]" consistent with this opinion. *Catalyst Health Solutions, Inc. v. Magill,* 414 Md. 457, 480, 995 A.2d 960, 974 (2010) (citations and quotations omitted); *Bowen v. City of Annapolis,* 402 Md. 587, 607–09, 937 A.2d 242, 254–55 (2007).

cannot be considered "a single package" pertaining to the annexation resolution, the Referendum Opponents note, because the Town Council voted on each individual resolution separately and recorded different votes for different resolutions. Moreover, they contend that the petition, as it stands, misleads the voters which ultimately undermines the integrity and reliability of the petition process.

In response, the Referendum Supporters argue that Article 23A supplies broad grants of legislative power to the citizens of the State's municipalities, including the right to petition their local legislative bodies to enact charter amendments or annex land, and the power of direct democracy through referendum. As such, the "mere mention—on the petition and ballot—of the three subsidiary resolutions as well as the [referable] annexation resolution [does not] violate[ ] the Annexation Statute and ... the referendum." Specifically, they argue that the resolutions are "four interrelated parts of a single legislative objective, all four parts of which stand or fall together" and were presented to the voters for a single vote of approval or disapproval of the annexation. According to the Referendum Supporters, the inclusion of the subsidiary resolutions with the annexation resolution amounts to mere surplusage, and to strike the petition down because of the subsidiary resolutions' inclusion would exalt form over substance.

▮ We begin our analysis by reviewing the applicable statute and statutory scheme at issue. Article XI–E of the Maryland Constitution governs all municipalities except Baltimore City, which is constitutionally the same as a home rule county. *See* Art. XI–A (relating to home rule counties and Baltimore City). A municipal corporation established pursuant to Art. XI–E is also subject to the provisions of Article 23A, § 19. *Maryland–National Capital Park & Planning Comm'n v. Mayor of Rockville,* 272 Md. 550, 558, 325 A.2d 748, 753 (1974). For example, although "[t]he extension of the boundaries of a municipality is a political matter ... regulated by the constitution or the legislature of the State ... the power to annex is delegated to the city or town by statute,

since those political entities [would otherwise] have no inherent powers to add to their size." *Mayor of Rockville v. Brookeville Tpk. Constr. Co.*, 246 Md. 117, 128–29, 228 A.2d 263, 270 (1967) (citation omitted). The General Assembly has provided in Article 23A, § 19 the power to annex and the manner of exercising that power. *Brookeville Tpk. Constr. Co.*, 246 Md. at 129, 228 A.2d at 270; *see also Koste v. Town of Oxford*, 431 Md. 14, 26, 63 A.3d 582, 590 (2013). Section 19 further provides that municipal corporations have the power to annex land to municipal boundaries upon the initiative of the municipality's legislative body or upon presentation of a written petition by the residents of the area to be annexed. *Mayor of Oakland v. Mayor of Mountain Lake Park*, 392 Md. 301, 322, 896 A.2d 1036, 1049 (2006); *Brookeville Tpk. Constr. Co.*, 246 Md. at 129, 228 A.2d at 270; *see also* Article 23A, § 19(a), (b) and (c).

The proposal for annexation shall be by "resolution." § 19(b)(1), (c). Section 19 specifies in several subsections that the "resolution" shall concern the enlargement of municipal boundaries. *See, e.g.,* § 19(a); (b)(1) ("The proposal for change [enlarging the municipality's corporate boundaries] may be initiated by resolution . . . ."); § 19(j) (referring to the "resolution proposing a change in the corporate boundaries of the municipal corporation"); § 19(*l*) (suggesting that the resolution is a "proposal for change"); § 19(m) (*"The provisions of this section shall authorize an increase in the area within any municipal corporation* only as to land which is not then within the corporate limits of any other municipal corporation.") (emphasis added); § 19(n) (discussing "[t]he resolution to add to the corporate boundaries of a municipal corporation . . ."). Section 19 also provides for what is to be included in the resolution. *See, e.g.,* § 19(b)(1) ("The resolution shall describe "by a survey of courses and distances . . . the exact area proposed to be included in the change, and shall contain complete and detailed provisions as to the conditions and circumstances applicable to the change in boundaries and to the residents and property within the area to be annexed.").

Additionally, in subsection (n), the nature of an annexation resolution is further explained:

The resolution to add to the corporate boundaries of a municipal corporation shall provide generally that the persons residing in the area to be annexed, and their property, shall be added to the corporate boundaries, generally subject or not subject, as the case may be, to the provisions of the charter of the municipal corporation. . . .

*See* § 19(n). We also note that § 19 provides for an "annexation plan" separate and apart from the resolution. *See* § 19(o)(1) ("In addition to, but not as a part of the resolution, the legislative body of the municipal corporation shall adopt an annexation plan for the area proposed to be annexed."); *see also Koste,* 431 Md. at 34, 63 A.3d at 594 (citations and quotations omitted) (noting that subsection (o) "provides that an annexation plan, containing additional information (not contained in the resolution necessarily), . . . be made available at the public hearing[,]" and that the "amendments to the annexation plan may not be construed in any way as an amendment to the resolution, nor may they serve in any manner to cause a reinitiation of the annexation procedure then in process").

The section of the Maryland Code on annexation also provides voters or the county in which the municipality is located with the opportunity to petition for a referendum election on the enacted annexation resolution. Article 23A, § 19(f), (g), and (h); see also *Mayor of Oakland,* 392 Md. at 323–24, 896 A.2d at 1049–50. The parties in the present case direct our attention specifically to subsection (g) which states:

At any time within the forty-five (45) day period following the final enactment of the resolution, a number of persons equal to not less than twenty per centum (20%) of the qualified voters of the municipal corporation may, in writing, petition the chief executive and administrative officer of the municipal corporation for a referendum on the resolution. Upon the presentation of a petition to the officer, he shall cause to be made a verification of the signatures thereon and shall ascertain that the persons signing the petition

represent at least twenty per centum (20%) of the qualified voters of the municipal corporation. Upon verifying that the requirements of this subsection have been complied with, the officer shall, by proclamation suspend the effectiveness of the resolution, contingent upon the results of the referendum.

Looking first to the plain meaning of subsection (g), we note that the language states that the voters "may, in writing, petition ... *for a referendum on the resolution ....* " § 19(g) (emphasis added). Although § 19(g) does not specify what a petition on "the resolution" encompasses, it is appropriate to look elsewhere in § 19, which outlines the municipal annexation process, for guidance. *See Koste,* 431 Md. at 30, 63 A.3d at 592 (citations and quotations omitted) (noting that "[t]he plain language of a statutory provision is not considered in isolation, however, but rather the plain language must be viewed within the context of the statutory scheme to which it belongs"). When we read the language of § 19(g) together with the other provisions of § 19, it is clear that "the resolution" refers to the "propos[al] [for] change in the corporate boundaries of the municipal corporation." *See* § 19(j); *see also* § 19(*l* ) (suggesting that the resolution is a "proposal for change"); § 19(m) (maintaining, in effect, that the resolution "shall authorize an increase in the area within any municipal corporation ..." of land not already within the corporate limits of another municipality); § 19(n) (noting that "the resolution" refers to a resolution proposing to "add to the corporate boundaries of a municipal corporation ..."). Similarly, our case law has interpreted the phrase "the resolution" as it is used in § 19 as a proposal to annex land to a municipality. *See Mayor of Oakland,* 392 Md. at 324–25, 896 A.2d at 1050 (referring to the resolution as it is used in § 19 and for the purposes of the petition as "the annexation resolution"); *see also Beshore v. Town of Bel Air,* 237 Md. 398, 410, 411, 206 A.2d 678, 684, 685 (1965) (noting that under § 19, the resolution is an "annexation resolution," and a "resolution providing for annexation by a municipality ...")

When viewed within the statutory scheme, the meaning of the phrase "the resolution" as it is used in § 19(g) unambiguously refers to the resolution proposing the annexation of land.[12] Following this analysis, therefore, Resolution 11–12a, which enlarges and extends the corporate boundaries of the Town of La Plata by 14.1 acres is considered a "resolution" for the purposes of the statute. Stated differently, the annexation resolution may be placed on a petition for referendum to the qualified voters of the municipal corporation of La Plata under § 19(g) because the resolution proposes to enlarge the corporate boundaries of the Town. On the other hand, the remaining three resolutions included on the petition, namely, Resolution 11–11a, 11–13, and 11–14a, are not annexation resolutions within the plain meaning of the statute.[13]

The Referendum Supporters contend that even if the additional Resolutions are not referable to the voters on their own under § 19(g), we should construe them together with Resolution 11–12a, as a "single resolution" because they are a part of a single legislative objective. The Referendum Supporters argue that this is reflected by the fact that the choice presented to the voters on the petition is either for or against "the annexation package." Based on a plain reading of the statute, however, this argument is unpersuasive.

The General Assembly made it clear in § 19(g) that the petition presented to voters shall be for a "referendum on the [annexation] resolution." [14] Moreover, the General Assembly

---

**12.** We recognize that this Court in *Koste* noted that there is ambiguity in the statute. *See Koste v. Town of Oxford*, 431 Md. 14, 29, 63 A.3d 582, 591 (2013). That ambiguity, however, is in reference to the part of the statute at issue in that case, namely *when* signature gathering may take place for purposes of the petition under § 19(g). The Court in *Koste* did not specifically analyze the definition of the term "the resolution" as it is used in the statute.

**13.** We note that the Referendum Supporters themselves concede that "[o]nly the annexation resolution was subject to a direct vote of approval or disapproval from the citizens of La Plata."

**14.** In past cases, this Court has read separate and independent bills or resolutions *in pari materia* "to determine their proper construction."

drew clear distinctions between the "annexation resolution" and the "annexation plan" in § 19. Specifically, as noted above, in § 19(o) the General Assembly clarified that the annexation plan (here, Resolution 11–13), and the annexation resolution (here, Resolution 11–12a), are not one in the same, but in fact serve two separate purposes and function separately. *See* § 19(o)(1) (stating that "[i]n addition to, *but not as a part of the resolution,* the legislative body of the municipal corporation shall adopt an annexation plan for the area proposed to be annexed") (emphasis added); § 19(o)(2) ("The annexation plan shall be open to public review and discussion at the public hearing, but *amendments to the annexation plan may not be construed in any way as an amendment to the resolution,* nor may they serve in any manner to cause a reinitiation of the annexation procedure then in process.") (emphasis added). This statutory framework separating "the resolution" from the "annexation plan" should not be ignored. *Cf. Mayor of Oakland,* 392 Md. at 327, 896 A.2d at 1052 (citations omitted) (referencing the idea that we construe a "statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory"). Therefore, the voters are entitled to vote only on the annexation resolution itself, but not on the remaining resolutions as part of a whole, or so-called "annexation package."

Notwithstanding the plain meaning of the statute, the Referendum Supporters contend that even though the petition for referendum included the non-referable resolutions, the placement of the additional resolutions on the petition amounts to mere surplusage, and rendering the petitions invalid exalts form over substance.

---

Kelly v. Marylanders for Sports Sanity, *310 Md. 437, 472, 530 A.2d 245, 262 (1987) (citations omitted) (discussing the "appropriation exception" to the right to petition for a State-wide referendum);* see also Doe v. Md. State Bd. of Elections, *428 Md. 596, 615, 53 A.3d 1111, 1122 (2012). At issue in this case, however, is not how a court will interpret four separate resolutions presented* separately. *The present case involves whether four separate resolutions, generally related, can be presented to* voters on a single *petition pursuant to § 19(g).*

The General Assembly, in drafting § 19(g), did not expressly prohibit the inclusion of additional or collateral information in the petition, and therefore we will not read such a prohibition into the statute. We thus look to our relevant precedent to determine whether the inclusion of the non-referable resolutions invalidates the petition for referendum. For parity of reasoning, we look to the standard for sufficiency of ballot language for amendment and referendum provisions, which states that "the Constitutional provisions ... require 'a clear, unambiguous and understandable statement of the full and complete nature of the issues undertaken to be included in the proposition.' " *Stop Slots MD 2008 v. State Bd. of Elections,* 424 Md. 163, 189, 34 A.3d 1164, 1179 (2012) (quoting *Anne Arundel Cnty. v. McDonough,* 277 Md. 271, 300, 354 A.2d 788, 805 (1976)). In *McDonough,* we held that a ballot question calling for a vote of either "FOR" or "AGAINST" rezoning of certain parcels "did not present a clear, unambiguous and understandable statement of the full and complete nature of the issues undertaken to be included in the proposition" and was therefore invalid. *McDonough,* 277 Md. at 300, 354 A.2d at 805. Thus, in reviewing the sufficiency of petitions for referendum, the Court must be concerned with the danger of potentially misleading voters or obfuscating the subject matter of the referendum resolution.

In this case, however, there is no real danger of confusion or ambiguity as to the subject of the petition for referendum. Although non-referable, the additional resolutions included in the petition serve only to further inform the voters on the nature of the annexation resolution that is the heart of the referendum. *See Koste,* 431 Md. at 37, 63 A.3d at 596 ("The law favors seemingly a presumption that voters will inform themselves fully of all accessible information before making a decision."). Therefore, we hold that because the inclusion of the additional resolutions does not obfuscate the subject matter of the petition for referendum on the annexation resolution, it does not invalidate the petition for referendum or render it legally insufficient.

## III.

In view of our disposition regarding the legal sufficiency of the petition in the present case, we also address whether, as a matter of law, La Plata's Town Manager had the power and authority to promulgate Town guidelines for the validation and verification of referendum petitions under § 19(g).

The Town and Referendum Supporters defend the Town Manager's publication of his eight-page document, entitled, "Procedures for Validation and Verification of Signatures on Annexation Referendum Petition Signatures Submitted Pursuant to [§ 19(g)]." They argue that even if § 19(g) does not explicitly authorize the Town Manager to create such guidelines, the statute grants him the implied authority to do so. According to the Town and Referendum Supporters, the implied authority comes from the specific grant to the chief executive and administrative officer the responsibility to verify petition signatures and ascertain that the persons signing the petition represent at least twenty percent of the qualified voters. *See* § 19(g). The Town and Referendum Supporters contend, therefore, that it is logical that the chief executive and administrative officer, the person charged with conducting the verification of petitions, be authorized to enact procedures explaining how to carry out the responsibilities expressly delegated to him or her under § 19(g) with regard to municipal land annexation referenda.

By contrast, the Referendum Opponents do not read § 19(g) so broadly to provide the Town Manager with the power and authority to create such guidelines. Rather, they contend that the statute grants the Town Manager limited verification duties as contained in the statute. The Referendum Opponents maintain that in lieu of giving the chief executive and administrative officer "unfettered discretion" to create and then modify such policies, we should apply common law or State election law containing specific guidelines and safeguards as to how a petition shall be filed and signatures verified.

The gravamen of this inquiry revolves around whether Mears had the authority, as Town Manager, to create such petition guidelines. To analyze Mears's power, we begin by reviewing his grant of authority under Article 23A, § 19(g):

"At any time within the forty-five (45) day period following the final enactment of the resolution, a number of persons equal to not less than 20 per centum (20%) of the qualified voters of the municipal corporation may, in writing, petition the chief executive and administrative officer of the municipal corporation for a referendum on the resolution. Upon the presentation of a petition to the officer, he shall cause to be made a verification of the signatures thereon and shall ascertain that the persons signing the petition represent at least twenty per centum (20%) of the qualified voters of the municipal corporation. Upon verifying that the requirements of this subsection have been complied with, the officer shall by proclamation suspend the effectiveness of the resolution, contingent upon the results of the referendum."

The statute unambiguously provides the chief executive and administrative officer of the municipal corporation, here the Town Manager, the power to "cause to be made a verification" of the signatures on the petition and ascertain that the requisite number of qualified signatures are present. § 19(g). The statute, therefore, does not grant the express authority to create verification and validation procedures. Generally, however, a government official or agency has reasonable discretion to carry out "fairly implied" powers incident to those duties or authority expressly granted. *See River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 543, 914 A.2d 770, 779–80 (2007) (recognizing that municipalities may exercise powers that are necessary, fairly implied, or incident to "the powers expressly granted"). The exercise of implied or discretionary authority is limited in that it must be exercised reasonably, not arbitrarily or capriciously. *See Harvey v. Marshall*, 389 Md. 243, 303, 884 A.2d 1171, 1207 (2005).

The issue is thus whether Mears's verification authority, by implication, includes the power to "establish[ ] a pro-

cess and criteria to guide the validation and verification of signatures [on a petition] ...” and to guide all future petition drives in La Plata under § 19(g). *See* Mears's Procedures. In *Burroughs v. Raynor*, 56 Md.App. 432, 468 A.2d 141 (1983), a similar question was asked regarding what powers the Election Supervisors had when charged with the responsibility to verify signatures on a City Council nominating petition to ensure it was “signed by not less than three percent of the voters who are eligible to vote for the office for which nomination by petition was sought.” 56 Md.App. at 434–35, 468 A.2d at 142. The Court of Special Appeals held that the nature of the verification requirement includes, in addition to counting the number of names on the petition, “determin[ing] that those names are in fact the names of registered voters of the appropriate jurisdiction.” 56 Md.App. at 439, 468 A.2d at 144. Similarly, in *Barnes v. State ex rel. Pinkney*, 236 Md. 564, 204 A.2d 787 (1964), this Court held that the Secretary of State had the authority to examine the signatures on a referendum petition for the purposes of determining the validity of the signatures. 236 Md. at 571, 204 A.2d at 791. These authorities indicate that where the statute imposing a duty to verify signatures is silent, the agency or official empowered with that duty may employ “reasonable means” to exercise that duty. *Burroughs*, 56 Md.App. at 440, 468 A.2d at 144 (citing *Barnes*, 236 Md. at 571, 204 A.2d at 791) (“Clearly the provisions of [the Constitution] will be furthered if, by proper and reasonable means, a referendum petition is to be put upon the ballot only if it has the requisite number of genuine signatures of registered voters.”).

Under the basic definition of “verification,” therefore, Mears's responsibility was to “cause to be made” an authentication of the signatures presented to him on the petition and confirm that the signatures represented enough qualified voters for a referendum election to take place.[15] In furtherance

---

15. We note that the trial court transcript indicates that the La Plata Town Manager might have assumed the responsibility of verifying

of this duty, Mears preemptively created and published procedures for petition validation and verification. These guidelines outlined in writing, for the benefit of the public, the "reasonable means" by which he was exercising his duty to verify signatures and validate the petition.

Moreover, Mears's action is consistent with Maryland administrative law, in that an agency may adopt regulations articulating the agency's interpretation of the law that it administers. *See DPSCS v. Demby,* 390 Md. 580, 604–07, 890 A.2d 310, 324–26 (2006); *Comptroller v. Miller,* 169 Md.App. 321, 346, 901 A.2d 229, 243 (2006), *aff'd,* 398 Md. 272, 920 A.2d 467 (2007) ("In general, an agency may enact rules that are either legislative or interpretive. A legislative rule is the product of an exercise of delegated legislative power to make the law through rules. An interpretive rule is any rule an agency issues without exercising delegated legislative power to make law through rules.") (citation and quotation omitted). Lastly, we note that the governmental transparency espoused by Mears's publication of the guidelines is consistent with the general principles of good government.

We therefore hold, not only that the petition for referendum was valid, but also that the Town Manager in the present case had the implied authority to create and publish procedures or guidelines for the conduct of petition validation and verification for purposes of the referendum.[16] In addition,

---

signatures under this statute in the past. During the trial court hearing, both sides referenced the "Heritage Green Project" annexation referendum, wherein the Town Manager did not promulgate written procedures for petition verification.

**16.** In view of our disposition of the case, we need not discuss whether, or to what extent, the State Election Law Article and State common law is applicable to the municipal land annexation referenda process. In the meantime, however, we note that there is no prohibition against a municipality properly adopting State election law and common law in promulgating policies governing a petition for referendum on land annexation. *Cf. Hill v. Mayor of Colmar Manor,* 210 Md. 46, 54, 122 A.2d 462, 466 (1956) (holding that although State election law is not by its own terms applicable to a municipal general election, it may be made applicable through incorporation in the Town charter); *see also*

we hold that the trial court erred when it concluded that Mears's publication of the verification guidelines several days before the petition was due violated the general public's due process rights. To establish a violation of due process, one must show that the State deprived him or her of a protected liberty or property interest through constitutionally inadequate procedures. *Knapp v. Smethurst,* 139 Md.App. 676, 703, 779 A.2d 970, 985 (2001). There is no fundamental liberty or property interest at issue in this case. Moreover, Mears was under no obligation to inform the public of the precise standards he would employ in validating a referendum petition, but apparently did so for the benefit of the public. Accordingly, there exists no violation of due process.

We hereby remand this case to the Circuit Court for further proceedings to resolve the outstanding claims in the Referendum Opponents' amended complaint, namely, Count V, alleging fraud in circulation with regard to fraudulent circulator's affidavits, and Count VI, alleging fraud in circulation with regard to misrepresentations to potential signers and inadequate anti-fraud measures.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY VACATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT TO BE PAID BY APPELLEES.**

*DuBois v. City of College Park,* 280 Md. 525, 532, 375 A.2d 1098, 1103 (1977) (noting that a provision of the state general election law was made applicable through the town charter).