**Gen. 73]** 73

## INTERSTATE COMPACTS

**HEALTH OCCUPATIONS – PHYSICIANS – WHETHER THE FULL INTERSTATE MEDICAL LICENSURE COMPACT COMMISSION CAN LIMIT THE POWERS OF ITS EXECUTIVE COMMITTEE – WHETHER THE SAME COMMISSION CAN ADMINISTER ANOTHER INTERSTATE COMPACT**

November 13, 2024

*Dr. Harbhajan S. Ajrawat*
*Chair, State Board of Physicians*

*Christine A. Farrelly*
*Executive Director, State Board of Physicians*

Maryland is a member of the Interstate Medical Licensure Compact (the "Compact"), which offers physicians a streamlined process for becoming licensed to practice medicine in multiple states. *See* 2018 Md. Laws, ch. 470; Md. Code Ann., Health Occ. ("HO") § 14-3A-01. The Compact establishes an agency, the Interstate Medical Licensure Compact Commission (the "Interstate Commission"), to administer the Compact, and further provides for an executive committee, which "shall have the power to act on behalf of the Interstate Commission, with the exception of rulemaking, during periods when the Interstate Commission is not in session." HO § 14-3A-01 (Compact §§ 11(a), (k), 12(1)).[1]

You have asked two questions about the powers of the Interstate Commission. First, you ask if the Compact allows the Interstate Commission to limit the executive committee's authority to act on the Commission's behalf when the Commission is not in session. Second, you question whether the Compact permits the Interstate Commission to serve as the "secretariat" of—or otherwise implement—other interstate licensing compacts.

As we explain in more detail below, our opinion is that the Compact permits the Interstate Commission to limit the executive committee's authority to act on the Commission's behalf when the Commission is not in session. Our view rests primarily on the plain language of the Compact, which not only limits the executive committee to acting "*on behalf of* the Interstate Commission" but also broadly authorizes the Commission to "[o]versee and maintain

---

[1] In this opinion, citations to "Compact" are to the individual sections of the Compact as codified in HO § 14-3A-01.

the administration of the Compact." Compact §§ 11(k) (emphasis added), 12(1).

We further conclude that the Interstate Commission may not serve as the "secretariat" of—or otherwise implement—another licensing compact, as that would be contrary to the plain language of the Compact. The purpose of the Compact is to develop "a comprehensive process that complements the existing licensing and regulatory authority of state medical boards" and "provides a streamlined process that allows physicians to become licensed in multiple states." *Id.* § 1. The purpose of the Interstate Commission, in turn, is simply to administer the Compact. *Id.* § 11(b). Implementing an entirely separate licensing compact would be inconsistent with that purpose.

# I
# Background

## A.   *Interstate Compacts*

An interstate compact is a "legal agreement between two or more states . . . to deal with a problem or concern that crosses state boundaries." Patricia S. Florestano, *Past and Present Utilization of Interstate Compacts in the United States*, 24 Publius 13, 14 (1994). Compacts have a "long and rich history" in the United States, *id.* at 18, with "roots deep" in the colonial era, Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 Yale L.J. 685, 692 (1925). Before the American Revolution, compacts between colonies required the approval of the Crown and primarily resolved boundary disputes. Florestano, *supra*, at 14. The Articles of Confederation, "framed by statesmen . . . familiar with the colonial methods," established a similar system, authorizing the use of compacts but requiring the consent of Congress, Frankfurter & Landis, *supra*, at 693-94.

Today, Article I, § 10, of the United States Constitution says that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State." U.S. Const., Art. I, § 10, cl. 3. "Read literally, the Compact Clause would require the States to obtain congressional approval before entering into any agreement among themselves." *United States Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 459 (1978). But "[d]espite the Constitution's use of the phrase 'any agreement or compact,' the Supreme Court has not interpreted that phrase to mean that every compact requires congressional consent." Jeffrey

B. Litwak, *Interstate Compact Law: Cases & Materials* 60 (4th ed. 2020). Instead, only compacts "'directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States,' . . . fall within the scope of the Clause" and require Congressional consent. *Cuyler v. Adams*, 449 U.S. 433, 440 (1981) (quoting *United States Steel*, 434 U.S. at 468). Thus, "state boundary settlements, agreements over jurisdiction of waters, and compacts that might have a discriminatory effect on nonparticipating states" generally require Congressional approval. *See* Florestano, *supra*, at 15. But consent ordinarily is not necessary for compacts "which establish channels of interstate relations, seek uniformity of law, or pertain to issues where state action is usual and predominant, such as education, child welfare, criminal law, or mental health." *Id.*; *see also* Ann O'M. Bowman & Neal D. Woods, *Strength in Numbers: Why States Join Interstate Compacts*, 7 St. Pol. & Pol'y Q. 347, 349 (2007) (noting that, while "[m]ost compacts are submitted to Congress for approval either before or soon after their enactment," "as a practical matter, only compacts that address areas of mutual federal-state concern require congressional consent"); Litwak, *supra*, at 37 ("Only approximately half of the compacts that exist today have received consent . . . .").

## B.    *Development of the Interstate Medical Licensure Compact*

In 2013, state medical boards began drafting a compact to streamline traditional medical-license application processes in light of the millions of new patients seeking care following the passage of the Affordable Care Act,[2] physician shortages, and the increased use of telemedicine. *A Faster Pathway to Physician Licensure*, Interstate Medical Licensure Compact Comm'n, https://www.imlcc.org/a-faster-pathway-to-physician-licensure/ (last visited Nov. 6, 2024) ("*A Faster Pathway*"); *Hearing on S.B. 234 Before the House Health & Gov't Operations Comm.*, 2018 Leg., Reg. Sess., at 2 (Mar. 28, 2018) (written testimony of Richard L. Masters, Interim Counsel to the Interstate Commission) ("Masters Testimony"). In June and September of 2013, "representatives from a cross-section of medical and osteopathic

---

[2] Enacted in March 2010, the Patient Protection and Affordable Care Act, also known as the Affordable Care Act, provided subsidies for lower income households to purchase health insurance and expanded the population of adults eligible for Medicaid coverage. United States Ctrs. for Medicare & Medicaid Servs., *Affordable Care Act (ACA)*, https://www.healthcare.gov/glossary/affordable-care-act/ (last visited Nov. 6, 2024).

boards" convened to debate the particulars "of what a compact might accomplish and what the organization of a compact system might resemble." Blake T. Maresh, *The Interstate Medical Licensure Compact*, 100 J. Med. Regul. 8, 20 (2014). In November 2013, a small group of state medical board executives, administrators, and attorneys met with staff of the Federation of State Medical Boards to begin drafting the compact. *Id.* at 21; *A Faster Pathway*, *supra*.

Over the next ten months, the team revised the draft language several times, with input from state medical boards, physician organizations, patient advocacy groups, hospitals, and the telehealth industry. *See* Masters Testimony at 2. In September 2014, the team released the final model legislative language. *Id.* Within months, lawmakers in sixteen states introduced legislation to join the Compact and, in February 2015, Wyoming became the first member state. Trevor Brown, *New Law Could Help Bring Physicians to Wyoming*, Wyo. Tribune-Eagle, Mar. 23, 2015.

On April 15, 2015, Alabama became the seventh state to join the Compact, bringing the number of member states above the threshold for the Compact to take legal effect. Marschall S. Smith, *The Interstate Medical Licensure Compact Commission*, 106 J. Med. Regul. 22, 22 (2020). Two years later, the Colorado Medical Board issued the first license under the Compact's licensing scheme. *Id.*

Maryland joined the Compact in 2018. *See* 2018 Md. Laws, ch. 470. Today, the Compact includes 40 states, the District of Columbia, and the territory of Guam. *A Faster Pathway*, *supra*.

## C.   *Text of the Compact*

The Compact, as with any interstate compact, has been "enacted virtually identically by every party state's legislature." Michael L. Buenger et al., *The Evolving Law and Use of Interstate Compacts* 36 (2d ed. 2016). In Maryland, the Compact language appears in § 14-3A-01 of the Health Occupations Article of the Maryland Annotated Code.

The first section sets out the purpose of the Compact: "to develop a comprehensive process that complements the existing licensing and regulatory authority of state medical boards" and "provides a streamlined process that allows physicians to become licensed in multiple states, thereby enhancing the portability of a medical license," "ensuring the safety of patients," and

"strengthen[ing] access to health care." Compact § 1. The Compact thereafter explains the "streamlined process" for multi-state licensure. A physician who meets the eligibility requirements files an application with the licensing board in the member state that the physician selects as the state of principal license. *Id.* §§ 3, 5(a). That member board evaluates whether the physician is eligible for expedited licensure and issues "a letter of qualification, verifying or denying the physician's eligibility," to the Interstate Commission, the agency established to administer the Compact. *Id.* § 5(b)(1). If verified, the physician then completes a registration process established by the Interstate Commission to receive a license in a member state. *Id.* § 5(c).

The Interstate Commission, which consists of two voting representatives appointed by each member state, has one purpose: "the administration of the Interstate Medical Licensure Compact." *Id.* § 11(a), (b), (d). The Compact provides that the Interstate Commission is "a body corporate and joint agency of the member states and shall have all the responsibilities, powers, and duties set forth in the Compact." *Id.* § 11(c). The Compact authorizes the Interstate Commission to "[o]versee and maintain the administration of the Compact" and "[p]erform such functions as may be necessary or appropriate to achieve the purposes of the Compact." *Id.* § 12(1), (21). More specifically, the Compact provides that the Interstate Commission has "the duty and power" to:

- promulgate rules for administering the Compact and "bylaws governing the management and operations of the Interstate Commission," *id.* (2), (16);

- enforce the Interstate Commission's rules and the Compact's provisions, *id.* (4);

- issue advisory opinions on "the meaning or interpretation of the Compact," *id.* (3);

- establish offices, manage property, purchase insurance, hire personnel and establish personnel policies, and employ an executive director, *id.* (7), (8), (9), (10), (11), (13), (14);

- establish a budget, accept donations and grants, and make expenditures, *id.* (6), (12), (15);

- maintain records and make annual reports to legislatures and governors of member states, *id.* (17), (19);

- coordinate education and training about the Compact, *id.* (18); and

- adopt a seal and protect intellectual property, *id.* (16), (20).

The Compact requires the Interstate Commission to meet at least once each calendar year. *Id.* § 11(e). "The chairperson may call additional meetings and shall call for a meeting on the request of a majority of the member states." *Id.*

The Compact also expressly requires the Interstate Commission to establish an executive committee:

> The Interstate Commission shall establish an executive committee, which shall include officers, members, and others as determined by the bylaws. The executive committee shall have the power to act on behalf of the Interstate Commission, with the exception of rulemaking, during periods when the Interstate Commission is not in session. When acting on behalf of the Interstate Commission, the executive committee shall oversee the administration of the Compact including enforcement and compliance with the provisions of the Compact, its bylaws and rules, and other such duties as necessary.

*Id.* § 11(k). The Compact elsewhere authorizes the Interstate Commission to "[e]stablish and appoint committees including, but not limited to, an executive committee as required by Section 11, which shall have the power to act on behalf of the Interstate Commission in carrying out its powers and duties[.]" *Id.* § 12(5); *see also id.* § 11(l) ("The Interstate Commission may establish other committees for governance and administration of the Compact.").

The Interstate Commission's bylaws state that the executive committee "shall be composed of all officers of the Commission and the chairperson of each [other] committee" that the Commission establishes, along with the Interstate Commission's immediate past chairperson. Interstate Medical Licensure

Compact Commission, Bylaws, Art. VII, § 1 (2020). The bylaws further provide that the executive committee "shall be empowered to act on behalf of the Commission during the interim between Commission meetings, except for rulemaking or amendment of the Compact or the[] Bylaws," and that "[t]he procedures, duties, budget, and tenure of [the] executive committee shall be determined by the Commission." *Id.*

## II
## Analysis

You have asked two questions about the Compact. First, does it allow the Interstate Commission to limit the executive committee's authority to act on the Commission's behalf when the Commission is not in session? And second, does the Compact permit the Interstate Commission to serve as the "secretariat" of—or otherwise implement—other licensing compacts? We shall address each of these questions in turn.

### A. *Whether the Interstate Commission May Limit the Executive Committee's Authority to Act on Behalf of the Commission*

Your first question is whether the Interstate Commission may limit the executive committee's authority to act on the Commission's behalf. You have expressed concern about the executive committee "conducting 'policymaking' on important topics," such as granting elected officers membership and participation rights in all the Interstate Commission's committees and giving the executive committee "full power over" the procurement process, "all . . . without any input from the full Commission." Letter from Harbhajan S. Ajrawat, Chair, Maryland Board of Physicians, et al., to Attorney General Anthony G. Brown, at 2 (July 25, 2024) ("Opinion Request"). According to your opinion request, the executive committee "has asserted that the full commission cannot itself place any limitations on the [e]xecutive [c]ommittee between meetings." *Id.* at 1. You thus ask: May the Interstate Commission limit the executive committee's authority to act on behalf of the Commission?

Before delving into our analysis, we must answer a more basic question: What substantive law governs the Compact? As noted above, *see supra* Part I.A, many compacts receive Congressional consent, which transforms the compacts into federal law. *See, e.g.*, *Cuyler*, 449 U.S. at 438 (recognizing that "the construction of an interstate agreement sanctioned by Congress under the Compact

Clause presents a federal question"); Buenger et al., *supra*, at 104 ("[I]t is undisputed that compacts receiving congressional consent are enforceable as federal law . . . ."). But "compacts not requiring consent" are "state law, not federal law." Buenger et al., *supra*, at 174; *see also McComb v. Wambaugh*, 934 F.2d 474, 479 (3d Cir. 1991) (concluding that a compact that did not receive Congressional consent "must be construed as state law"). The Interstate Medical Licensure Compact has not received Congressional consent. *See* Facts About the IMLCC, Interstate Medical Licensure Compact Commission, https://www.imlcc.org/about/ (last visited Nov. 6, 2024) (noting that "[t]he Compact is not . . . a product of Congress or any executive branch agency or administration" but "*is an agreement among sovereign states with the Commission as an independent organization*" (emphasis in original)). As such, we must apply state law to construe the Compact.

But that still leaves the question of which state law to apply. *See, e.g.*, Buenger et al., *supra*, at 187 (recognizing that "[d]etermining the applicable law for compacts is a difficult problem"). The Compact, like most interstate compacts, *id.* at 187-88, does not specify what substantive law applies to the interpretation of the Compact's language. If the number of member states were much smaller, we might consider the law of each state. *See, e.g.*, *Oklahoma v. New Mexico*, 501 U.S. 221, 247 (1991) (taking into account contract law principles of all three states that belonged to a compact involving the Canadian River). But, given that the Compact has 40 member states plus Guam and the District of Columbia, the sheer number of member states here makes that approach impractical. Instead, we will venture to apply relevant legal principles that appear to represent the majority approach among all member states. *Cf.* Buenger et al., *supra*, at 165 ("The holy grail of handling compact cases is to ensure a consistent interpretation of a compact among the member states.").

Having resolved this preliminary question, we move on to the interpretation of the Compact itself. "Compact law . . . is still largely undeveloped," Litwak, *supra*, at vii, though certain broad principles have emerged. Interstate compacts are "concurrently statutes" and contracts "between the party states." Buenger et al., *supra*, at 33-34 (citing *Green v. Biddle*, 21 U.S. (8 Wheat.) 1 (1823)); *accord* Florestano, *supra*, at 13 (describing an interstate compact as "a legal document that combines the attributes of a state statute and a contract"). "[A]s laws adopted by state legislatures, compacts are statutes that are binding upon the member states and their citizens as any other statute adopted by a state legislature."

Buenger et al., *supra*, at 35. But because "those statutory enactments contain reciprocal promises and create reciprocal obligations," "they are also considered concurrently as contracts between the member states." *Id.*

"Interpretation of compacts has the same goal as interpretation of statutes and contracts—to find the intent of the legislatures as the parties to the compact." Litwak, *supra*, at 297. "The implication of th[e] dual character of compacts is that courts frequently cite and apply statutory and contract law principles when . . . interpreting a compact." Buenger et al., *supra*, at 35. But "[t]here is no scholarship or case law explaining when compact agencies or courts should apply contract law principles or should apply statutory interpretation principles, or how to resolve conflicting interpretations of compacts using these contract or statutory principles." *Id.* at 35-36.

Regardless, "[c]onsidering the plain terms of a compact or contract is the first order of business when construing both contracts and statutes." Buenger et al., *supra*, at 165; *see also, e.g.*, 2A *Sutherland Statutes & Statutory Construction* § 47:1 (7th ed., Nov. 2024 update) (noting that "the language of a statute itself" is "the first resource to which courts turn" to construe a statute); 11 *Williston on Contracts* § 32:2 (4th ed., May 2024 update) (recognizing that "the primary purpose and function of [a] court in interpreting a contract is to ascertain and give effect to the parties' intention," which is, "first and foremost, determined by the language used in their agreement"). We thus begin our analysis by looking at the text of the Compact itself.

*1. Plain Language*

As already noted, *see supra* Part I.C, the Compact expressly provides that "[t]he executive committee shall have the power to act on behalf of the Interstate Commission, with the exception of rulemaking, during periods when the Interstate Commission is not in session," Compact § 11(k). This appears to give broad authority to the executive committee to perform any task that the Commission may perform, aside from rulemaking, at least when the Commission is not in session.

But we see at least two restrictions on that broad authority. First, § 11(k) itself limits the executive committee to "act[ing] *on behalf of* the Interstate Commission." Compact § 11(k) (emphasis added). As numerous member states' courts have acknowledged in other contexts, the phrase "on behalf of" has a "common

understanding" that is "neither technical nor ambiguous." *J.C. Penney Co. v. Commissioner of Econ. Sec.*, 353 N.W.2d 243, 246-47 (Minn. Ct. App. 1984). It means "in the interest of" or "as a representative of," *Thomas v. Logue*, 191 N.E.3d 1155, 1162 (Ohio Ct. App. 2022) (quoting *Merriam-Webster's Collegiate Dictionary* 110 (11th ed. 2014)), *aff'd*, 174 Ohio St.3d 66 (2023); "on the part of" or "done by," *id.* (quoting *New Oxford American Dictionary* 150 (3d ed. 2010)); "[f]or the benefit of" or "[a]s the agent of," *id.* (alterations in original) (quoting *American Heritage Dictionary of the English Language* 162 (5th ed. 2018)); or as "a proxy for" or in "aid of (someone)," *id.* (quoting *Random House Dictionary of the English Language* 188 (2d ed. 1987)).[3] Indeed, some courts have said that the use of this phrase may invoke an agency relationship,[4] which "results from the manifestation of consent by one person to another that the other shall act on [their] behalf *and subject to [their] control*, and consent by the other so to act." Restatement (Second) of Agency § 1 (Am. Law Inst. 1958) (emphasis added). Regardless of whether the use of the phrase "on behalf of" here establishes the executive committee as the Interstate Commission's agent, we think the language authorizes the Commission to specify which tasks it wishes the executive committee to carry out. After all, a committee cannot act on behalf of a parent body when it performs functions that the parent body does not want the committee to perform. Thus, the use of the phrase "on behalf of" in § 11(k) connotes that the Interstate Commission has at least some power to limit the type of tasks that the executive committee may carry out.

The second limitation on the executive committee's authority, as we see it, is the Compact's sweeping grant of power to the Interstate Commission to "[o]versee and maintain the administration of the Compact," Compact § 12(1), by, among other things, adopting "bylaws governing the management and operations of the Interstate Commission," *id.* §§ 12(16), 14(a), and deciding how often to meet, *id.* § 11(e). Because the Compact's

---

[3] *Accord Scottsdale Ins. Co. v. Harsco Corp.*, 199 N.E. 3d 1210, 1218 (Ind. Ct. App. 2022); *Rohde v. Ann Arbor Pub. Schs.*, 265 Mich. App. 702, 707 (Ct. App. 2007), *aff'd*, 479 Mich. 336 (2007); *Antini v. Antini*, 2019 OK 20, ¶¶ 15-16; *Sauter ex rel. Sauter v. Houston Cas. Co.*, 168 Wash. App. 348, 355 (2012).

[4] *See Baker Bus Serv., Inc. v. Keith*, 416 A.2d 727, 730 (Me. 1980) (discussing the phrase in the context of public labor relations law); *Bissette v. Univ. of Miss. Med. Ctr.*, 282 So.3d 507, 514 (Miss. Ct. App. 2019) (mentioning the phrase in the context of an employment dispute); *Skeels v. Suder*, 671 S.W.3d 664, 673 (Tex. 2023) (considering the phrase in the context of a corporate resolution).

provisions "shall be liberally construed to effectuate its purposes," *id.* § 23(b), we read sections 12 and 14 to broadly authorize the Interstate Commission to determine how it—and, consequently, its subparts (such as the executive committee)—will operate. The Interstate Commission could, for example, decide to meet frequently, necessarily limiting how much the executive committee can accomplish, given that the committee may "act on behalf of the Interstate Commission" only "during periods when the Interstate Commission is not in session." *Id.* § 11(k).

We note, too, that the power and obligation to adopt bylaws gives the Interstate Commission considerable discretion in deciding how it will carry out its duties and delegate tasks to its various committees, including the executive committee. After all, the Interstate Commission is a "body corporate," *id.* § 11(c), and "the bylaws of a corporation are the rules of its life," such that until bylaws have been adopted, "the corporation may not be able to act for the purposes of its creation," 8 *Fletcher Cyclopedia of the Law of Corporations* § 4170 (Sept. 2024 update); *cf.* Maresh, *supra*, at 21 ("Because the compact itself is essentially a multi-state contract enacted as legislation, by necessity its provisions must remain broad."). Thus, while the "bylaws must be consistent with the nature, purposes and objects of the corporation," 8 *Fletcher Cyclopedia*, *supra*, § 4190, we see nothing in the Compact's language that would prohibit the Interstate Commission from adopting bylaws limiting the tasks that the executive committee may perform on the Commission's behalf. And, as it happens, the Commission has expressly adopted bylaws providing that "[t]he procedures, duties, budget, and tenure of [the] executive committee shall be determined by the Commission." Interstate Medical Licensure Compact Commission, Bylaws, Art. VII, § 1.

We are also guided by the principle that an agency generally has "reasonable discretion to carry out fairly implied powers incident to those duties or authority expressly granted." *Thornton Mellon LLC v. Frederick County Sheriff*, 479 Md. 474, 481-82 (2022) (quoting *Town of La Plata v. Faison-Rosewick, LLC*, 434 Md. 496, 523 (2013)); *see also*, *e.g.*, 3 *Sutherland Statutes & Statutory Construction* § 65:4 (8th ed., Nov. 2024 update) (noting that "courts understand that the grant of an express power carries with it the authority to exercise all other activities reasonably necessary to carry it into effect"). In order to "[o]versee and maintain the administration of the Compact," Compact § 12(1), we think it reasonably necessary for the Interstate Commission to have the power to make internal operating decisions, including choices about what tasks to have the executive committee perform.

To summarize, we think the plain language of the Compact allows the Interstate Commission to limit the authority of the executive committee to act on the Commission's behalf. Specifically, we think that the use of the phrase "on behalf of" in § 11(k), along with the Compact's broad grant of authority to the Interstate Commission to oversee the management of the Compact by adopting bylaws and deciding how often to meet, give the Interstate Commission the power to limit the tasks that the [e]xecutive [c]ommittee may perform. The general principle that an agency has implied powers attendant to its express powers reinforces our reading of the Compact.

### 2. *Legislative History and Other Interstate Compacts*

Usually, with a question of statutory interpretation, we would also consider the legislative history of the text in question. *See, e.g.*, 2A *Sutherland Statutes & Statutory Construction*, *supra*, § 48:3 (recognizing that "[c]ourts look to a statute's contemporary history and historical background as aids to interpretation"); *Neal v. Baltimore City Bd. of Sch. Comm'rs*, 467 Md. 399, 415-16, 424-26 (2020) (using legislative history to confirm an interpretation of a statute's text); *Blackstone v. Sharma*, 461 Md. 87, 119-20 (2018) (looking to legislative history to resolve an ambiguity in a statute). But the scant historical record here is of limited value. Although the Compact is the result of legislation in each of the member states, it was not these legislatures but, rather, a small team of state medical board executives, administrators, and attorneys who drafted the Compact's language. *Supra* Part I.B. As we understand it, however, there are no meeting minutes, recordings, or notes of the drafting sessions.

The chief legal officer of the Federation of State Medical Boards, which assisted in the drafting process, did provide us copies of earlier drafts of the Compact. The relevant language changed little during the drafting process. *Compare* Compact §§ 11, 12, 14, *with* First Draft §§ 10, 11, 13 (December 2013); Second Draft §§ 11, 12, 14 (May 5, 2014); Third Draft §§ 11, 12, 14 (July 16, 2014); Fourth Draft §§ 11, 12, 14 (Aug. 11, 2014). But we find one change notable. While the original draft said that "[t]he executive committee shall oversee the administration of the Compact," First Draft § 10, the final Compact language says: "*When acting on behalf of the Interstate Commission*, the executive committee shall oversee the administration of the Compact," Compact § 11(k) (emphasis added). This, in our view, supports our conclusion that the drafters intended the executive committee to be subject to the control of the Interstate Commission as a whole.

We also note that several other interstate compacts that predate the Compact here also require the creation of an executive committee. These compacts expressly provide that the agencies administering the compacts have the power to dictate the duties and tasks of their executive committees. For example, the Interstate Compact for the Supervision of Adult Offenders contains the following language:

> The Interstate Commission shall establish an Executive Committee which shall include commission officers, members and others as shall be determined by the By-laws. The Executive Committee shall have the power to act on behalf of the Interstate Commission during periods when the Interstate Commission is not in session, with the exception of rulemaking and/or amendment to the Compact. The Executive Committee oversees the day-to-day activities managed by the Executive Director and Interstate Commission staff; administers enforcement and compliance with the provisions of the compact, its by-laws and *as directed by the Interstate Commission* and performs other duties *as directed by Commission* or set forth in the By-laws.

Interstate Compact for the Supervision of Adult Offenders, Art. III (emphasis added). The Interstate Compact for Juveniles, which regulates the interstate movement of juveniles who run away to another state or are under court supervision, *see About the Interstate Compact for Juveniles*, Interstate Commission for Juveniles (last visited Nov. 6, 2024), similarly provides that its executive committee shall "perform[] such other duties *as directed by the Interstate Commission*," Interstate Compact for Juveniles, Art. III, F (emphasis added).

The Compact here does not expressly provide in § 11(k) that the executive committee shall perform duties "as directed by the Interstate Commission," an omission that could in theory suggest that the drafters here did not intend to grant that much oversight authority to the Commission. But we think it just as likely— perhaps even more likely—that the drafters thought that the language they adopted already implied that power. As noted above, the relevant provision of the Compact states that the executive committee shall act "on behalf of the Interstate

Commission." It is possible, then, that the drafters of the Compact here intended to adopt the substance of the executive committee provisions of other interstate compacts and simply chose different words to convey the idea that the Interstate Commission has the power to decide the tasks and functions of the executive committee. *Cf.* 2B *Sutherland Statutes & Statutory Construction* § 52:1 (7th ed., Nov. 2024 update) (noting that "statutes frequently are copied from state to state" and "[c]ourts have noted that similar statutes of other states comprise a type of extrinsic aid which may deserve special attention"); *id.* § 52:3 (noting that "[c]ourts look to the phraseology and language of similar legislation . . . to determine the general policy and objectives of a particular course of legislation").

In any event, the Compact's limited legislative history and the language in other interstate compacts do not dissuade us from reading the Compact's plain language to permit the Interstate Commission to specify the tasks that the executive committee may carry out.

### 3. Agency Deference

Another interpretative tool that we may consider is the Interstate Commission's own interpretation of the Compact and whether it permits the Commission to limit the executive committee's authority to act on the Commission's behalf. *See* Litwak, *supra*, at 301 (noting that "courts may . . . defer to . . . compact agencies' interpretation of statutes that they administer"); *cf.* 2B *Sutherland Statutes & Statutory Construction*, *supra*, § 49:4 (recognizing that "[s]tate[] courts typically offer some level of deference to a state agency interpretation"). The Compact allows the Interstate Commission to issue "advisory opinions concerning the meaning or interpretation of the Compact," Compact § 12(3), but the Commission has not issued any opinion regarding the question before us. The body has, however, adopted bylaws, including the one that states, "The procedures, duties, budget, and tenure of [the] executive committee shall be determined by the [Interstate] Commission." Interstate Medical Licensure Compact Commission, Bylaws, Art. VII, § 1 (2020). This, we think, indicates that the Interstate Commission itself reads the Compact as allowing the Interstate Commission to define the powers of the executive committee.[5] Although this may not be a formal agency

---

[5] You indicate in your opinion request that the *chair* of the Interstate Commission has "issued a letter . . . claiming that the full commission cannot place any limitation or restrictions on the . . . [e]xecutive

interpretation, we find it persuasive evidence that our own reading is correct and that the Compact allows the Commission to define the duties of the executive committee. *See* 2B *Sutherland Statutes & Statutory Construction*, supra, § 49:4 (noting that some courts have distinguished between "formal agency interpretations" and "informal interpretations," characterizing the latter as entitled to deference only insofar as they have the power to persuade).

### 4. Contract Principles

We have thus far analyzed your question under principles of statutory interpretation. But, as already noted, interstate compacts "are also considered concurrently as contracts between the member states," Buenger et al., *supra*, at 35, and courts sometimes apply contract principles when resolving questions about interstate compacts, *see, e.g.*, *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 628 (2013) ("Interstate compacts are construed as contracts under the principles of contract law."). Although it is not always clear when to apply contract principles as opposed to statutory interpretation principles, *see* Buenger et al., *supra*, at 35-36, at least one authority has indicated that "courts generally apply a statutory construction approach" when determining whether a state or compact agency "applied the [c]ompact in a permissible manner," while "courts typically apply principles governing interpretation of contracts" "[w]hen interpreting a [c]ompact to determine whether a party state is in breach of the [c]ompact," Interstate Comm'n for Adult Offender Supervision, *ICAOS Bench Book for Judges and Court Personnel* 14 (14th ed. 2024).

In any event, we think that our analysis thus far has already taken into account whatever factors that contract law might require. We have looked to the plain language of the Compact[6] and its

---

[c]ommittee's actions because doing so would be *ultra vires*." Opinion Request 1. You provided us a copy of this letter, which is signed by the chair and references "advice of counsel," presumably by the Interstate Commission's attorney. Letter from Karen Silas, Chair of the Interstate Medical Licensure Compact Commission, to Christine A. Farrelly, Executive Director of the Maryland Board of Physicians, and Ellen Douglas Smith, Deputy Director, at 1, 3, 5 (April 26, 2024). But nothing in the letter indicates that it reflects the opinion of the *Interstate Commission* itself.

[6] *See, e.g.*, 11 *Williston on Contracts*, *supra*, § 32:2 (recognizing that "the parties' intention" is, "first and foremost, determined by the language used in their agreement"); Buenger et al., *supra*, at 55

limited drafting history.[7]  We have also considered how other compacts predating the Interstate Medical Licensure Compact have addressed the division of labor between compact agencies and their executive committees.  "Looking to the customary practices employed in other interstate compacts"—what in contract law is called "usage of trade"—may be helpful in "ascertain[ing] the intent of the parties to" a particular compact.  *Herrmann*, 569 U.S. at 633; *see also Black's Law Dictionary* (12th ed. 2024) (defining "trade usage" as "[a] practice or method of dealing having such regular observance in a region, vocation, or trade that it justifies an expectation that it will be observed in a given transaction," or "a customary practice or set of practices relied on as norms by persons conversant in, or connected with, a trade or business").  These other compacts permit commissions to determine the duties of their executive committees, a fact that, if anything, bolsters our view that the Compact here similarly allows the Interstate Commission to decide what tasks and functions the Executive Committee may perform.  The consideration of contract principles, then, does not change our view of the Compact.

### 5.    *Summary*

To summarize, our opinion is that the Compact permits the Interstate Commission to limit the executive committee's authority to act on the Commission's behalf when the Commission is not in session.  We base this opinion on the plain language of the Compact, which authorizes the executive committee to act "on behalf of" the Interstate Commission and empowers the Commission to "[o]versee and maintain the administration of the Compact," Compact § 12(1), by, among other things, adopting "bylaws governing the management and operations of the Interstate Commission," *id.* §§ 12(16), 14(a), and deciding how often to meet, *id.* § 11(e).  We are also mindful that an agency generally has "reasonable discretion to carry out fairly implied powers incident to those duties or authority expressly granted," *Thornton Mellon LLC*, 479 Md. at 481-82 (2022), and we think it reasonably necessary, for the Interstate Commission to "[o]versee and maintain the administration of the Compact," Compact § 12(1), that it have the power to make internal operating decisions, including

---

(recognizing that, "as the case with any contract controversy," "the text of a compact is the starting point" for analysis).

[7] *See, e.g.*, *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 469 (2003) (recognizing that "relevant extrinsic evidence" may inform the interpretation of an ambiguous contract); *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo.1993) (en banc) (same).

choices about what tasks the executive committee should perform. None of the extrinsic aids available to us—the Compact's very limited legislative history, the language of other interstate compacts that predate the Compact here, and the Commission's own view of the Compact as expressed in its bylaws—have convinced us that our reading of the plain language is incorrect. Nor have any relevant contract principles. We thus conclude that the Interstate Commission may limit the Executive Committee's authority to act on the Commission's behalf when the Commission is not in session.

### B. The Interstate Commission's Power to Implement Other Compacts

Your second question is whether the Compact allows the Interstate Commission to "become the 'secretariat'" of "or otherwise implement" other licensing compacts. During a May 2023 meeting of the Interstate Commission, the body's legal counsel noted that "interest ha[d] been expressed in the [Interstate] Commission serving as a 'secretariat' for the Physician Assistant's Compact Commission."[8] Interstate Commission, May 16, 2023, Meeting Minutes 3. One member of the Interstate Commission expressed a concern about the physician assistant compact's proposed model for authorizing physician assistants to practice in different states and asked his fellow Commissioners to consider using the Interstate Commission "as a vehicle to offer an alternative model and legislative language patterned after" the Interstate Medical Licensure Compact. *Id.* Several other Commissioners said that the Interstate Commission should not get involved in the physician assistant compact, and the body voted to close the discussion without taking action. *Id.* at 3-4. Then, in October 2024, the executive committee voted to authorize the Interstate Commission's executive director to respond to any possible request for proposals to provide "secretariat and system services" to the physician assistant compact commission. Interstate Medical Licensure Compact Commission Executive Committee, Oct. 8, 2024 Draft Meeting Minutes 5. It is our understanding that "secretariat services" would entail providing a tracking system,

---

[8] By September 2024, the physician assistant compact had reached its activation threshold of seven states, and a physician assistant compact commission met to "begin work to operationalize the compact." PA Licensure Compact, https://www.pacompact.org/ (last visited Nov. 6, 2024). Becoming fully operational was expected to take up to 24 months after activation. *Id.*

customer service, and administrative support to the physician assistant compact commission.[9]

There have also been discussions about the Interstate Commission's involvement in a podiatry licensing compact. During a June 2024 meeting of the executive committee, the Interstate Commission's executive director indicated that "[d]iscussions [were continuing] with the Federation of Podiatric Medical Boards regarding providing assistance in their efforts to create an expedited licensure compact for Podiatrists." Interstate Commission Executive Committee, June 11, 2024, Meeting Minutes 4.[10]

You have thus asked us whether the Compact allows the Interstate Commission to "become the 'secretariat'" of "or otherwise implement" other licensing compacts such as the physician assistant compact and podiatry compact.

To resolve this question, we turn again to principles of statutory interpretation. See 3 *Sutherland Statutes & Statutory Construction*, *supra*, § 65:1 (recognizing that "questions about the extent and nature of the power granted" to an agency "are very much in the realm of statutory interpretation"). Because "an agency exists and has any authority only as a matter of legislative grant," it has "only those powers granted . . . expressly" by statute "or by necessary implication." *Id.* §§ 65:1, 65:3; *see also id.* § 65:4 (noting that "courts understand that the grant of an express power carries with it the authority to exercise all other activities reasonably necessary to carry it into effect"). Thus, "[t]he enabling statute granting such authority is an obvious and appropriate source

---

[9] Other compact agencies have also relied on outside support for such services. *See* Litwak, *supra*, at 119 (noting that "[s]ome compact entities use other organizations for secretariat support," and "several professional associations have . . . provided administration services to newly forming compact agencies before those commissions hired staff").

[10] "A podiatrist is a Doctor of Podiatric Medicine (DPM), known also as a podiatric physician or surgeon, qualified by their education and training to diagnose and treat conditions affecting the foot, ankle and related structures of the leg." Doctor of Podiatric Medicine (DPM), American Association of Colleges of Podiatric Medicine, https://aacpm.org/becoming-a-podiatric-physician/ (last visited Nov. 6, 2024). Generally, podiatrists are licensed separately from other physicians. *See, e.g.*, HO § 14-313 (governing the issuance of licenses to physicians by the Board of Physicians); HO § 16-305 (governing the issuance of licenses to podiatrists by the Board of Podiatric Medical Examiners).

of information about the nature and extent of the power granted." *Id.* § 65:1; *see also* Fredrick L. Zimmermann & Mitchell Wendell, *The Interstate Compact Since 1925*, at 54 (1951) ("The powers of . . . a compact commission are fixed by the compact . . . .").

We consider also principles of corporate law, given the Interstate Commission's status as a body corporate. Compact § 11(c). "The rules governing the construction of corporate charters are generally the same as those that govern the construction and interpretation of statutes, contracts and other written instruments." 7A *Fletcher Cyclopedia of the Law of Corporations* § 3640 (Sept. 2024 update). Pursuant to those rules, "[a] corporation may exercise only those powers that are granted to it by law, by its charter or articles of incorporation, and by any bylaws made pursuant to the laws or charter." *Id.* § 3399. These powers may be express or implied, the latter encompassing those "contracts and transactions reasonably incidental to [the corporation's] business purposes." James D. Cox and Thomas Lee Hazen, 1 *Treatise on the Law of Corporations* § 4:2 (3d. ed., Nov. 2023 update). Importantly, however, "[t]he statement of the purposes or objectives in the corporation's articles of incorporation is controlling over the powers or authority of the corporation's management." *Id.*; *see also* 6 *Fletcher Cyclopedia of the Law of Corporations* § 2482 (Sept. 2024 update) ("The powers of a corporation also may be restricted by a limited or narrow purpose clause in its articles of incorporation."); *id.* § 2487 (noting that "a power that is reasonably necessary or convenient to carry out the business and affairs of the corporation logically cannot extend beyond the scope of the corporate purposes as set forth in the articles of incorporation"). Thus, a purpose statement "defin[es] the scope of the authorized corporate enterprise or undertaking," and "both confers and limits the officers' and directors' authority by impliedly excluding activities that are not in furtherance of the stated purposes." 1 Cox & Hazen, *supra*, § 4:1; *see also* 6 *Fletcher Cyclopedia*, *supra*, § 2477 ("The enumeration of powers implies the exclusion of all others that are not reasonably incidental.").

We return, then, to the language of the Compact itself. As noted above, *see supra* Part I.C, the first section sets out the purpose of the Compact. It reads in its entirety:

> In order to strengthen access to health care, and in recognition of the advances in the delivery of health care, the member states of the Interstate Medical Licensure Compact have allied in common purpose to develop a

comprehensive process that complements the existing licensing and regulatory authority of state medical boards, and provides a streamlined process that allows physicians to become licensed in multiple states, thereby enhancing the portability of a medical license and ensuring the safety of patients. The Compact creates another pathway for licensure and does not otherwise change a state's existing Medical Practice Act. The Compact also adopts the prevailing standard for licensure and affirms that the practice of medicine occurs where the patient is located at the time of the physician-patient encounter, and therefore requires the physician to be under the jurisdiction of the state medical board where the patient is located. State medical boards that participate in the Compact retain the jurisdiction to impose an adverse action against a license to practice medicine in that state issued to a physician through the procedures in the Compact.

Compact § 1. The Compact also creates the Interstate Commission, *id.* § 11(a), and provides that "[t]he purpose of the Interstate Commission is the administration of the Interstate Medical Licensure Compact," *id.* § 11(b). The Compact then expressly enumerates certain powers of the Interstate Commission, including the power to "[e]nforce compliance with Compact provisions," "[e]stablish and appoint committees," "[e]stablish and maintain one or more offices," "[a]dopt a seal and bylaws," and "[e]mploy an executive director." *Id.* § 12. This list of powers concludes with the power to "[p]erform such functions as may be necessary or appropriate to achieve the purposes of the Compact." *Id.* § 12(21).

Reading this plain language, we conclude that the Interstate Commission has the power to administer the Interstate Medical Licensure Compact and to carry out any tasks implicitly related to that purpose. See 3 *Sutherland Statutes & Statutory Construction*, *supra*, § 65:1. But implementing an entirely different licensing compact is not, in our view, reasonably necessary or incidental to administering the Interstate Medical Licensure Compact. We thus conclude that the Interstate Commission may not become the secretariat of, or otherwise implement, another licensing compact.

We acknowledge that, at the executive committee's October meeting, the Interstate Commission's legal counsel apparently reached a different conclusion. It is our understanding that he advised committee members that the Compact allows the Commission to help manage another compact because the Interstate Medical Licensure Compact authorizes the Commission to perform "such functions as may be necessary or appropriate to achieve the purposes of the Compact." Compact § 12(21). According to that argument, those purposes would include "strengthen[ing] access to health care," "enhancing . . . portability of a medical license," and "develop[ing] a . . . process that complements the existing licensing and regulatory authority of state medical boards." *Id.* § 1.

We respectfully disagree. Under the plain language of the Compact, the Interstate Commission has only one purpose: "the administration of the Interstate Medical Licensure Compact." Compact § 11(b). Although this implicitly authorizes the Interstate Commission to carry out any tasks that are reasonably necessary or incidental to administering the Compact, we fail to see how providing secretariat services to an entity administering an entirely different licensing compact furthers the administration of the Interstate Medical Licensure Compact.

Section 12 of the Compact, authorizing the Interstate Commission to "[p]erform such functions as may be necessary or appropriate to achieve the purposes of the Compact," *id.* § 12(21), does not persuade us otherwise. This provision follows a list of twenty other "dut[ies] and power[s]"—such as leasing property, *id.* § 12(13), hiring staff, *id.* § 12(10), and applying for intellectual property protections, *id.* § 12(20)—that are reasonably necessary or incidental to administering the Compact. Although it is true that § 12(21) refers to functions that are necessary or appropriate to achieve the purposes of *the Compact*, rather than the purpose of the Interstate Commission, we cannot read that language in a vacuum or without reference to the specific language stating that the Interstate Commission's sole purpose is to administer the Compact itself. *See, e.g.*, 2A *Sutherland Statutes & Statutory Construction*, *supra*, § 46:5 (recognizing that, when construing a statute, one must "construe all parts of a statute together, without according undue importance to a single or isolated portion"). If the Interstate Commission's powers were read to permit it to perform duties that are not even incidental to administering the Compact, then the language limiting the Commission's purpose in § 11(b) would be a nullity. Rather than reading § 11(b) out of the Compact, we use that language to inform our understanding of § 12(21) as

authorizing the Interstate Commission to perform tasks that, like those expressly enumerated in § 12, are related to the administration of the Compact.

In any event, even if we were to focus solely on the purposes of the Compact as articulated in Section 1 and not the specific purpose of the Interstate Commission as articulated in Section 11, we do not think that the purposes of the Compact are broad enough to suggest that the Interstate Commission can administer another compact.  To be sure, the Compact indicates that member states "have allied in common purpose" "[i]n order to strengthen access to health care" and "to develop a comprehensive process that complements the existing licensing and regulatory authority of state medical boards."  Compact § 1.  But they have sought to do so through a very specific enterprise: developing a streamlined process for physicians to become licensed in multiple states.  *See id.*  Thus, the purpose of the Compact is not, as the Commission's attorney apparently suggested, to "strengthen access to health care," *id.*, or to complement state medical boards' existing authority *in the abstract*, but to do so through this streamlined, multi-state physician licensing scheme.

Finally, the fact that many states' medical boards issue licenses for both physicians and physician assistants does not mean that the member states of the Compact intended the Interstate Commission to be involved in the licensing of physician assistants. Through the plain language of the Compact, legislators made clear their intent that the Compact apply only to physician licensing, and that the Interstate Commission be limited in purpose to administering this Compact.  As such, the Interstate Commission has only those powers that are reasonably necessary and incidental to administering the Compact.  We thus conclude that the Commission may not serve as a secretariat of, or otherwise implement, another licensing compact.

**III**
**Conclusion**

We conclude that the Compact permits the Interstate Commission to limit the executive committee's authority to act on the Commission's behalf when the Commission is not in session. We further conclude that the Interstate Commission may not serve as the "secretariat" of—or otherwise implement—another licensing compact.

Anthony G. Brown
Attorney General of Maryland

Rachel A. Simmonsen
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice